Commonwealth ex rel. Simon, Appellant, *v.* Maroney.

Argued September 28, 1961. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

*Martin Lubow,* for appellant.

*Samuel Strauss,* Assistant District Attorney, with him *Edward C. Boyle,* District Attorney, for appellee.

Opinion by Mr. Justice Musmanno, December 12, 1961:

During the month of May, 1942, the community in Pittsburgh known as Overbrook was terrorized by sudden appearances and equally rapid disappearances of a person wearing a blue hood who sprang upon women and girls with obvious larcenous and libidinous intent.

On June 2, 1942, the police seized an eighteen-year youth who answered to the description given by the victims of the hooded assailant. It turned out to be John Simon, the appellant in this case. The telltale hood was found on his person. Police investigation, plus investigation by victims pointed quite specifically to him as the person responsible for the Overbrook crimes. He was taken before a magistrate for a preliminary hearing and eventually was brought to court for trial.

The specific charges on which he was indicted were: Robbery of Marian Davis, robbery of Evelyn Williams, statutory rape of Janet Major, statutory rape of Dolores Klein, robbery of Kathryn I. Fisher, and assault and battery with intent to commit rape on Louise Guskey.

On June 18, 1942, in the Court of Oyer and Terminer and General Jail Delivery of Allegheny County, he pleaded guilty to all charges except robbery of Mrs. Fisher. This charge was accordingly withdrawn and the indictment non prossed. The presiding judge sentenced him to prison for an aggregate term of from 20 to 40 years.

In 1952 he filed a petition for a writ of habeas corpus averring that he had been denied due process because he was without an attorney at the proceedings in court on June 18, 1942. After a full hearing, the petition was discharged. At that hearing it developed that the asserted rape of Janet Major had not been consummated. The charge was accordingly changed to

attempted rape and the sentence on the covering indictment was reduced from 3-6 years to $2\frac{1}{2}$-5 years.

On March 10, 1960, another petition for writ of habeas corpus was filed in the Court of Common Pleas of Allegheny County. A rule to show cause issued and, after the taking of testimony and the presentation of arguments, lasting in all three days, the rule was discharged and the petition dismissed. The petitioner then appealed to the Superior Court which affirmed the decision of the court of common pleas. We granted allocatur.

There is only one question to be decided in this appeal. Was the petitioner denied due process because he had no lawyer to represent him in court on June 18, 1942?

Article I, Section 9 of the Pennsylvania Constitution guarantees to every accused the right to counsel. In capital cases this provision is mandatory. Whether the defendant desires or does not desire to be represented by counsel, an attorney must be provided in murder cases. However, where noncapital charges are involved, the defendant himself determines whether he wishes to proceed without the benefit of a lawyer's advice and assistance.

The Commonwealth has indicated that since Simon did not request counsel at the time of his hearing in court, no constitutional right was denied him. It is true that decisions of this and of the Superior Court support this position, but such a view is not supportable if the facts in any particular case reveal that the circumstances surrounding the trial or hearing were such that the fundamentals of a fair trial were vitiated because of absence of counsel. For instance, if the defendant were deaf or blind, or otherwise so disabled that he could not adequately understand or follow the court proceedings, it would be a sheer mockery of law and justice to assume that he had had a fair trial in

the absence of counsel, even though he did not ask for one.

Constitutional guarantees are intended to achieve human justice and not merely to erect academic fences which may or may not keep out flagrant inequities which no civilized government would condone. Thus, it may not be argued that since the Constitution says only that the accused "hath a right to be heard by himself and his counsel," the Commonwealth is not required to supply counsel where the circumstances dictate the need for an attorney, even if the defendant does not ask for one.

And that brings us to the crucial issue in this case. The defendant was not wholly a normal person, using the word *normal* not in the criminological sense (because it could be argued that every criminal is nonnormal) but strictly from a mental point of view. A behavior clinic study made of the defendant shortly after his arrest revealed him to be a high grade moron with an intelligence quotient of 59. Counsel for the defendant therefore argues in this appeal that since the defendant was young and of low mentality the absence of counsel constituted a denial of due process which entitles him to release from custody. In this connection he cites the case of *Commonwealth ex rel. Swieczkowski v. Burke,* 173 Pa. Superior Ct. 363, 366, where the Superior Court said: "Youth, lack of education, inexperience with the intricacies of criminal procedure, improper conduct on the part of the court or prosecuting officials, and the complicated nature of the offense charged may, in some combination, constitute the 'ingredient of unfairness' which renders the absence of counsel at sentencing a denial of due process."

But the hypotheses enumerated in that case do not concatenate in the case at bar. There were no "intricacies of criminal procedure," no "improper conduct on the part of the court or prosecuting officials," and

nothing complicated about the charges of robbery and rape. We dismiss without comment the statement of defendant's counsel at the oral argument that he (counsel) did not know the meaning of robbery and rape until he came to those subjects in law school!

In the Federal criminal courts, the employment of counsel for defendants is imperative. By virtue of the Sixth Amendment to the United States Constitution, "counsel must be furnished to an indigent defendant prosecuted in a federal court in every case, whatever the circumstances." (*Foster v. Illinois,* 332 U. S. 134.) However, the Supreme Court of the United States held in that case, that "Prosecutions in State courts are not subject to this fixed requirement." But there is this modification. "process of law in order to be 'due' does require that a State give a defendant ample opportunity to meet an accusation."

What is the criterion for determination of "dueness" in process of law? Justice FRANKFURTER declared that if, because of absence of counsel, "an ingredient of unfairness actively operated in the process that resulted in his [the defendant's] confinement," then there has been lack of due process.

The touchstone, therefore, to apply in the case at bar is the rule of "ingredient of unfairness." The Supreme Court said in the *Foster* case that the mere fact that the record did not show that the defendant had been offered the benefit of counsel did not of itself prove absence of due process: "We thus have in effect the bald claim that, merely because the record does not disclose an offer of counsel to a defendant upon a plea of guilty, although the court before accepting the plea duly advised him of his 'rights of Trial' and of the consequences of such a plea, he is 'deprived of rights essential to a fair hearing under the Federal Constitution.' . . . We reject such a claim."

Was there any "ingredient of unfairness" in the disposition of John Simon's case on June 18, 1942? Although the behavior clinic report showed the 18-year-old defendant to have had a mental age of only nine at the time of the commission of the offenses imputed to him, this did not mean that in conducting himself in the exigencies of life he had only the mental and physical equipment of a nine-year-old child. As stated by the lower court: "while tests showed that Simon's mental age was about nine years, we understand that a person with a chronological age of eighteen and a mental age of nine is a far different person from one both physically and mentally aged nine. The fund of knowledge and experiences acquired during the years increases the capabilities and understanding of such a person far beyond that of a nine year old child. (Clinical Psychiatry by Dr. Arthur P. Noyes, page 310)."

The transcript of the court hearing shows that Simon was entirely aware of what was taking place. The first question put to him was: "Mr. Simon, you have signed pleas of guilty to the charge of robbery, another charge of robbery, a third charge of robbery, one indictment of statutory rape, a second indictment of statutory rape, and a bill for assault and battery with intent to commit rape. Do you understand what you have signed?" His reply was: "Yes, but I only had five."

The assistant district attorney then informed him that he was charged with three robberies and two rapes, "that is . . . you had relations with a girl under the age of sixteen and one where you tried to do that."

Simon replied: "There is one lady that accused me of robbing her and I never robbed her." The questioning continued: "Q. Well, then, we will leave that out. Marion Davis is O.K. is that right—you robbed her? A. Yes. Q. And Catherine Fisher, you robbed that lady? A. No, that is the one that I never robbed. Q. You want that laid aside, very well then. Evalyn Williams, you robbed

her? A. Yes. Q. Janet Major you raped her? You know her? That is correct about her? A. Yes. Q. And Dolores Kline, that is the young lady here, that is correct is that right? A. Yes. Q. And this is Louise Guskey here. Do you recall her? A. Yes."

He was questioned further: "Q. How old are you? A. Eighteen. Q. With whom do you live? A. With my mother. Q. Is your father living? A. I do not know. I have not seen him ten years ago. Q. How many years did you go to school? A. I have been going since I was six. Q. What school did you attend? A. Luckey. Q. Where is that? A. West End. Q. How far did you get in school? A. A special class. Q. What grade did you go to? A. That is the special class. Q. You were working for the W. P. A. before you got into this trouble? A. Yes. Q. Where were you working on the W. P. A.? A. In McKees Rocks. Q. Do you have any brothers or sisters? A. Yes. Q. How many? A. Three brothers and one sister. Q. Are they older than you? A. Two younger. Q. What does your mother do for a living? A. I was working on the W. P. A. and I got fired. Q. Why did you do these things, all of which are charged during the month of May? A. Well, I needed some money because my mother thought I was working. Q. You mean you tried to attack these people and you took some money because you were frightened of your mother for not bringing money home on Payday? A. Yes. Q. Why did you attack these girls? A. I didn't realize what I was doing. Q. How many times have you been in Juvenile Court? A. About three or four. Q. Why were you taken to Juvenile Court? A. For stealing. Q. What kind of things did you take? A. Bicycles and things like that. Q. Can you read all right? A. No. Q. Is there anything else that you want to tell us? A. No. Q. You can sign your name, can't you? A. Yes."

There is nothing in this transcript which suggests that the defendant was not cognizant of what was tak-

ing place in court. Some of the victims of his violence were in court and described the manner in which he treated them. The judge who presided at the habeas corpus hearing was the same judge who presided when the defendant pleaded guilty. He said: "After reading the transcript here the writer of this opinion generally remembers the case, and is satisfied that the defendant not only knew he was in a courtroom but understood what was involved in the charges and that he was pleading guilty to them."

The defendant's explanation as to why he committed the robberies reveals a mind capable of reasoning, even if the reasoning ignores the elements of honesty and integrity. He related how he had been discharged from his job, but that he did not want his mother to know this. Since he would have to display money in order to carry out the appearance that he was still gainfully employed, he resorted to robbing and stealing to get the money which he could pass off as wages.

Simon had no trouble in answering the questions put to him. He already had had some knowledge of courtrooms since he had previously been in juvenile court and therefore knew about attorneys. At the habeas corpus hearing he was questioned and answered as follows: "Q. John, at the time of your hearing you never asked for a lawyer, did you? A. You mean at the first one? Q. Yes, in 1942. A. No, I didn't."

In addition, it was established at the habeas corpus hearing that the procedure in criminal court in Allegheny County in 1942 provided for announcement to all prisoners as they came into court for arraignment that if they did not have an attorney and would ask for one, an attorney would be supplied. The description of this procedure was given by the assistant district attorney who had been on duty in 1942, and his testimony was not controverted. Moreover, the defendant himself admitted that one of his fellow-prisoners

had told him the court would appoint an attorney to represent him, but he did not request an attorney.

The lower court found as a fact that Simon was thoroughly aware of his right to ask for an attorney and we conclude that in that finding the court did not abuse its discretion.

Simon was conscious of and had a thoroughly informed memory on the crimes he had committed. He told the police how he had prepared the club with which he had struck down one of his victims, he led the police to the spot where he had placed a pocket-book he had stolen. He described how he made up from overalls the hood which he wore as he committed his depredations. When he appeared before the behavior clinic he related in detail the manner in which he accomplished his numerous offenses. At the hearing in court he voluntarily signed the pleas of guilty. Although illiterate he knew how to write some words and wrote a particularly filthy word on a pocketbook he had taken from one of the women he had robbed.

Judge McNAUGHER in his able opinion in the court below stated: "Dr. E. H. Davis, the present Director of the Behavior Clinic, after reading the reports of the examinations made at the time of sentence as well as those in 1959 and 1960 by Dr. James Baker, consulting psychiatrist of the State Correctional Institution at Pittsburgh, examined the defendant just before the hearing and testified that Simon was capable of understanding that he was in a courtroom, the nature of the charges to which he was pleading guilty when they were explained to him as they were, and that had the examining physician felt he was not capable of doing so the recommendation would have been that he be committed to a proper institution and his plea of guilty would not have been accepted, with or without counsel."

A review of the transcript of the habeas corpus hearing, which covers 339 pages, fails to disclose a scintilla of evidence which would suggest in the remotest manner that the defendant was at any time ever treated unfairly. Nor does the record suggest any inability on the part of the defendant to understand the long series of questions put to him in direct and cross-examination. He replied not only with understanding but often with shrewdness and cunning.

For instance, he stated that when he was arrested the police beat him, punched him, broke a boil he had on his hand and in other ways maltreated him in order to force him to sign a confession. No one can read the transcript of the record without concluding that Simon's story was manufactured in the laboratory of desperation and embellished in the workshop of self-gain. In the first place, there was no written confession in the case. In the second place, the spuriousness of the beating story vividly proclaims itself in the fact that Simon waited eighteen years before making the charge of police brutality. The only description he could give of the police who were supposed to have beaten him was that one was a "big fat guy" and the other "wore a straw hat." Common sense repels and fundamental logic rejects the proposition that one hurt by the police in the manner stated by the defendant would not at once tell what had happened at the first opportunity to do so. Not only did Simon say nothing about this alleged beating when he appeared in court but even in the privacy and cloistered atmosphere of the behavior clinic he made no reference to the alleged police misconduct.

Moreover, he was given a thorough physical examination at the clinic which examination would have revealed marks of the supposed beating, but there were no marks or signs of any mistreatment. Even the attorney who represented Simon at the 1952 habeas cor-

pus hearing testified that Simon had said nothing to him about the police threatening or beating him.

The record in this case is not only bare of any suggestion of unfairness toward the defendant but it reveals, on the contrary, an active solicitude by the court and all agencies involved to accomplish a proper solution of the legal and sociological problems raised by the evidence.

The hearing judge was Judge WILLIAM H. MC-NAUGHER (currently President Judge of the Allegheny County 16-Judge Court of Common Pleas), a veteran of the courts with profound juristic ability, of impeccable impartiality, even temperament and conscientious application to duty. Before sentencing the defendant, he conferred with Judge SCHRAMM of the juvenile court who had had the defendant in that court several times prior to his appearance in criminal court. In addition, Judge McNAUGHER made use of the facilities of the behavior clinic which is staffed by psychiatrists, psychologists and trained social investigators who are charged with the task of evaluating the facts in the background of defendants referred to them. This clinic, after a psychiatric, psychological, physical and social study of John Simon, submitted to Judge McNAUGHER a 25-page report in which it recommended: "Inasmuch as we feel that he is a potentially dangerous individual and will repeat similar offenses in the future, we would recommend prolonged or indefinite institutionalization such as the School for Defective Delinquents at Huntingdon. If admission there is not possible at this time, we would suggest incarceration until he can be accepted."

Simon could not be admitted to Huntingdon at the time because he was beyond the then maximum admittance age of 18. Since the report stated he was not psychotic he could not be committed to a mental institution. Thus, under the physical necessities of the

case, the hearing judge had no choice but to commit the defendant to the penitentiary.

The American Civil Liberties Union has filed a brief in this case in the capacity of amicus curiae. In that brief it makes the bold assertion that "improper conduct on the part of the court or prosecuting officials" are factors "present in this case." It goes further and says that these factors "are not disputed by the Commonwealth."

This averment finds no confirmation in the record. In fact, the exact opposite is true. The Commonwealth very much disputes that there was any "improper conduct on the part of the court or prosecuting officials."

Having made the unsupported statements just indicated the American Civil Liberties Union's brief then asserts that the "rationale of the Uveges and Herman cases requires the granting of the writ."

The cases of *Uveges v. Pa.,* 335 U. S. 437, and *Pennsylvania ex rel. Herman v. Claudy,* 350 U. S. 116, do not require the granting of the writ since they cover situations wholly different from the one involved in the appeal before us. A case cited as binding authority must be so similar to the one in controversy that if it were likened to the map of a country and were placed over the map of the controverted case, the borders of the controverted case would so coincide with the outline and configuration of the cited case that the two maps, generally speaking, could be interchangeable.

Using that illustration in this appeal we find that if the *Uveges* case were placed over the facts in the *Simon* case, the comparison would reveal two entirely different countries. In the *Uveges* case the relator petitioned for a writ of habeas corpus and was *denied* a hearing. In the *Simon* case the petitioner received not one but two hearings on the identical issue. At the second hearing in this case the Commonwealth could have pleaded res judicata but, out of an excess of con-

sideration for the defendant, did not do so. In the *Uveges* case the petitioner alleged that " ' frightened by threats of dire consequences if he dared to stand trial, relator pleaded guilty under the direction of an assistant district attorney, with the understanding that a sentence to Huntingdon Reformatory would be imposed.' "

In the *Simon* case there were no threats of dire circumstances if the defendant stood trial, nor was the defendant directed to plead guilty and there was no promise as to the sentence which would be imposed. Simon did, at the second hearing, as already stated, speak of police abuse but he did not even charge such abuse in his petition for the writ.

In the *Uveges* case there was an "undenied allegation" that the defendant was "never advised of his right to counsel." In the *Simon* case there was proof that the defendant was informed of his right to counsel.

In the *Uveges* case the Supreme Court stated that its members entertained two views regarding the necessity for counsel in noncapital cases: "Some members of the Court think that where serious offenses are charged, failure of a court to offer counsel in state criminal trials deprives an accused of rights under the Fourteenth Amendment . . . Others of us think that when a crime subject to capital punishment is not involved, each case depends on its own facts . . . Where the gravity of the crime and other factors—such as the age and education of the defendant, the conduct of the court or the prosecuting officials, and the complicated nature of the offense charged and the possible defenses thereto—render criminal proceedings without counsel *so apt to result in injustice as to be fundamentally unfair,* the latter group holds that the accused must have legal assistance under the Amendment whether he pleads guilty or elects to stand trial, whether he requests counsel or not." (Emphasis supplied.)

The controlling phraseology of this direction is that where the factors enumerated "render criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair," the furnishing of counsel is imperative. But we have seen that in this case the proceedings not only did not result in injustice but there was not the slightest approximation to what might be considered "fundamentally unfair."

The *Herman* case is also distantly removed authoritatively from the *Simon* case. There, the relator charged "that his pleas of guilty were the result of coercion and threats by state officers and . . . that at no stage of the proceedings was he either advised of his right to or given the benefit of counsel." *A hearing was refused.* The Court pointed out that the relator asserted that "a state trooper grabbed him by the neck and threatened to choke him if he did not confess and there were threats against the safety of his wife and daughter. Petitioner finally confessed after 72 hours of intermittent questioning and was taken to a justice of the peace . . . he was taken before the Court of Common Pleas and charged with some 30 offenses. The assistant prosecuting attorney demanded that petitioner sign a plea of guilty to all the charges. When petitioner asked what he was signing, the assistant prosecuting attorney said 'Sign your name and forget it.' Petitioner was not informed of the seriousness of the charges by the prosecutor or the judge; he did not know that his plea of guilty could result in a maximum sentence of some 315 years; he did not know nor was he informed that he could have counsel. . . . The District Attorney did not deny that petitioner had been told in the courtroom to 'Sign your name and forget it,' but denied only 'that the statements were made by the Assistant District Attorney in order to obtain pleas to the charges involved.' "

It would be superfluity in the extreme to state that the situation in the *Herman* case cannot possibly be similarized to the facts in the case at bar.

John Simon's guilt has been proved beyond every peradventure of doubt. He admitted his guilt in open court, he admitted it before committing magistrates, he admitted it when examined at the behavior clinic, he told his mother of some of his crimes, when he arrived at the penitentiary he related what he had done. He made four applications to the Pardon Board for commutation of sentence and in each instance he acknowledged his guilt. Indeed in his petition for the writ of habeas corpus he does not even allege innocence. His counsel goes further and says that in these proceedings the question of innocence or guilt is irrelevant.

It is true that in habeas corpus hearings the emphasis is placed on the jurisdiction of the tribunal and the regularity of the proceedings which resulted in the petitioner's detention, but in the particular circumstances of this case where we are endeavoring to ascertain whether any element of unfairness has entered into the entire transaction, the question of the credibility of the defendant becomes an issue. Since he admits the crimes attributed to him, the inference may arise (in the absence of any evidence to the contrary) that he did not ask for counsel because he believed that with a plea of guilt he did not need counsel. This would strengthen the position of the Commonwealth that Simon knew he could have counsel but that, reflectively, decided to dispense with counsel.

Of course, where there is the slightest suggestion, the merest intimation, the thinnest shadow of a possibility that a person charged with crime is innocent, every technicality in the law is his to command and use. So-called technicalities have been introduced into our legal system for a purpose, and even though they may be capable of misuse they still remain as bulwarks

of safety for the accused who is entitled at all times to the presumption of innocence until legally proved guilty.

After having said this much, it must also be said that where there exists not even the shadow of a shadow of doubt that the defendant's legal rights were protected and the evidence excludes the possibility of innocence as absolutely as the center of the earth excludes the light of the sun, it would be stultification of reason and a mockery of law to release a proved criminal on the empty assertion that he may not have known that he was entitled to counsel.

Where the intellect is informed, the reason satisfied and the judgment content that the defendant's rights have not been infringed and the final disposition of the case squares with conscience, morality and the most scrupulous dictates of justice, it would be turning the law into sport to release a confessed and convicted criminal on the abstract theoretical argument that since he did not have a lawyer at his side, it must be dogmatically assumed that he was unfairly deprived of something.

We have considered all other matters raised by counsel for the appellant and are satisfied that the lower court disposed of those matters properly. For instance, there is nothing in the record to justify the appellant's claim that "public hysteria" influenced the case. There was no public hysteria. As stated by the hearing judge, "there was considerable publicity, as would be expected from the type of crimes and the number committed in the same geographical area within such a short period, but the police investigation and the plea hearing were conducted in a routine manner."

The appellant complains that he was detained four days before formal charges were filed, but, as stated in the court below, "Considering the number and nature of the offenses involved, the intervening period,

spent in completing necessary investigations, was justified."

We agree with Judge McNaugher who said: "The total of the sentences of not less than twenty or more than forty years not only was fully merited on the basis of the atrocious crimes committed, but it also took account of the findings of the Behavior Clinic that he was a potential menace to society. Furthermore, the latest examinations, conducted recently by the Penitentiary authorities and the Behavior Clinic, as well as previous ones, indicate that the prisoner has undergone little if any change for the better in the eighteen years since the sentences were imposed. Had there been marked improvement, the Pardon Board at one or another of the four separate applications for clemency might have been led to grant commutation."

We have no doubt that if and when the parole authorities are convinced that the appellant may be released with safety to society and himself, proper action will be taken. There is no justification, however, for that release on any alleged basis that there was any "ingredient of unfairness" in the proceedings which resulted in his incarceration. The order of the court below, therefore, is affirmed.

––––––

DISSENTING OPINION BY MR. JUSTICE COHEN:

Only a waiver of counsel, understandingly made, justifies trial without counsel. The philosophy behind this view is "that the due process clause of the Fourteenth Amendment or the Fifth Amendment requires counsel for all persons charged with serious crimes, when necessary for their adequate defense, in order that such persons may be advised how to conduct their trials."

In my opinion, the youth, lack of education, inexperience, low mentality and the improper conduct on

the part of the prosecuting officials here are in such combination so as to supply the ingredients of unfairness which represent a denial of due process.

*Uveges v. Pa.*, 335 U. S. 437, is authoritative. I dissent.