388 A.2d 324

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Benjamin Franklin DAVIS, Appellant.**

Supreme Court of Pennsylvania.

Argued May 26, 1977.

Decided June 29, 1978.

Glenn C. Vaughn, York, for appellant.

Donald L. Reihart, Dist. Atty., Sheryl Ann Dorney, Asst. Dist. Atty., for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POM-
EROY, NIX and MANDERINO, JJ.

### OPINION OF THE COURT

EAGEN, Chief Justice.

Benjamin Franklin Davis was convicted by a jury in York
County of murder of the first degree.[1] Proceedings were
then conducted pursuant to the Pennsylvania Sentencing
Code, 18 Pa.C.S.A. § 1311 (Supp.1977–78), and the jury fixed
the penalty at death. Post-verdict motions were later de-
nied and sentence of death was imposed as the jury directed.
This appeal followed.

During the trial and also during the hearing conducted
under the Sentencing Code, Davis was permitted by the trial
court to represent himself,[2] although the public defender
was directed by the court to stand by for Davis "to confer
with." It is first urged that the court committed reversible
error in permitting Davis to represent himself because: "1)
the record does not affirmatively show Davis to have been
literate, competent and understanding and to have been
voluntarily exercising his free will in refusing the assistance
of counsel; and 2) Davis was not made aware and warned of
the dangers and disadvantages of self-representation in this
capital case."

In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45
L.Ed.2d 562 (1976), the Court made it clear that a defendant
in a state criminal trial has a constitutional right to rep-
resent himself if he voluntarily and intelligently elects to do
so.

 In relevant part the Court said this:

"The question before us now is whether a defendant in a
*state* criminal trial has a constitutional right to proceed

---

**1.** Davis was also convicted in the same trial of robbery and a
violation of the Firearms Act, but judgments of sentence were not
imposed on these convictions.

**2.** However, in the prosecution of post-verdict motions in the trial
court at the time of sentencing and in the prosecution of this appeal,
Davis has been represented by counsel.

without counsel when he voluntarily and intelligently elects to do so. Stated another way, the question is whether a state may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense. It is not an easy question, but we have concluded that a state may not *constitutionally* do so." [Emphasis added.] 422 U.S. at 807, 95 S.Ct. at 2527.[3]

Thus, as to this assignment of error, the crucial question is: did Davis "voluntarily and intelligently" elect to represent himself? The trial court concluded he did and, in our view, the record clearly supports this conclusion. Pertinently, the record discloses this:

Silas "Babe" Feder was fatally shot while being robbed at a newsstand he operated in the City of York on April 19, 1975. Davis was taken into police custody in New York City for the crimes on May 31, and, after a hearing, was ordered extradited to Pennsylvania on August 22. He was arraigned before the Court of Common Pleas of York County on September 5. On September 8, the public defender entered an appearance on Davis' behalf and trial was listed for September 15.

On September 15, the case was called for trial. The Chief Public Defender, Attorney John H. Chronister, and Davis appeared before the court and the following ensued:

3. Art. I, Section 9 of the 1968 Constitution of Pennsylvania provides in relevant part, "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel . . .." The prior Constitution of December 16, 1873, as amended, November 7, 1961, contained an identical provision and by way of dicta in *Commonwealth ex rel. Simon v. Maroney,* 405 Pa. 562, 176 A.2d 94 (1961), this Court said the right to counsel under the Pennsylvania Constitution is mandatory in capital cases and "whether the defendant desires or does not desire to be represented by counsel, an attorney must be provided in murder cases." 405 Pa. at 564, 176 A.2d at 95. This patently conflicts with the ruling in *Faretta*. If a criminal defendant in a state trial has the right under the Federal Constitution to waive the assistance of counsel, this right may not be curtailed by the provisions of the Pennsylvania Constitution. Additionally, cf. Pa.R.Crim.P. 316(c). Cf. also *Commonwealth ex rel. Robinson v. Myers,* 420 Pa. 72, 215 A.2d 637 (1966).

278

[MR. CHRONISTER:]

"Your Honor, in this case I was asked to talk with Mr. Davis and determine if I could be ready to proceed with trial in a week's notice. In my opinion I am not ready to proceed with trial at this time, however there are not— this is not because the issues are so complex or difficult that I could not try it at this time, it is as a result of the fact that Mr. Davis had indicated to me that it is his preference that I not act as defense counsel in this sense, he wishes to have the case tried in a certain manner. He has given me instructions as to how he wishes to have the case tried. I feel what he says to be unexceptionable [sic] as a basis of handling the case. He has asked me not to present any defense, to sit idly by and let the conviction be obtained. I do not concur in this and I think he is wrong in doing it, and I have advised him of this. I have also informed him of course I can't force him to do what I want him to do, that he is the one who is on trial, and he is the one who has the final say in what we will do and won't do insofar as I am able to determine.

"I am sort of at a loss here, I really don't know what my obligations are insofar as when my client indicates he wants to proceed in one way, and I feel it wrong, whether I should follow his instructions, or handle it as I see fit.

"Mr. Davis indicates he does wish to go to trial and he is prepared to have all the cases against him tried today to get them over with, and that if I don't follow his instructions, he is quite prepared to continue himself, and see that his instructions are carried out that way. Does that fairly state the situation, Mr. Davis?

[MR. DAVIS:]

"Right."

The trial judge then proceeded to explain to Davis the nature and seriousness of the charges, and the possible punishments he faced in the event he were found guilty.

In answer to the court's question, "Do you understand that," Davis replied, "Yeah."

The trial judge then went on to advise Davis that he had the right to represent himself but he cautioned against it. The court explained how a lawyer could help in the questioning and selection of the jurors, the opening statement to the jury, the questioning of witnesses, the introduction of evidence, the final argument to the jury, as well as in other functions in the trial. After this explanation, which Davis indicated he understood, the trial judge said to Davis, "Maybe you can do these things by yourself, but I would say to you, Mr. Davis, a lawyer who is experienced can do them better."

The trial judge then elicited from Davis that he was nineteen-years-of-age, that he was from Newburgh, New York, and had an "eleventh grade education."

After Davis again said he wished to represent himself, the trial judge repeated he was exposing himself to a possible death sentence. To this Davis replied, "Yeah, you know, like let's get it over with."

Finally, the trial judge inquired, "Why do you want it this way?" Davis responded, "I'd rather not say."

The trial judge then ordered the trial to proceed, and directed the public defender to stand by and be "available for advice." The trial judge also advised Davis that if he had any questions or wanted to talk to "your attorney just ask for a brief recess and we will give it to you."

The trial judge also explained that a psychiatrist and a doctor were available if Davis wished to talk to them. Davis replied: "Let the record show I know what I am doing. Hey, there is nothing wrong with me mentally or physically, okay?"

Mr. Chronister then went on to say this to the Court:

"I have talked to Mr. Davis on several occasions. He seems to understand everything I tell him. He responds intelligently to the discussions that we have. His answers are appropriate. I see no indication of anything that would show that he doesn't know what he is doing as far as a psychiatric evaluation is concerned or anything like

that. The only discussion I had with him about a psychiatrist was that if a First Degree Murder verdict should be returned, and we wanted to present mitigating testimony, that a psychiatrist might be of help at that time. He has indicated there is no mental problem, and he does not wish to be examined by one."

Finally, before proceeding with the voir dire of the jurors the trial judge inquired if Davis had "anything else to say," to which Davis answered, "No . . . let's get it over with."

The Commonwealth introduced the testimony of sixteen witnesses in support of the charges against Davis. This included one eyewitness who unequivocally identified Davis as the robber and killer of Feder, a witness who identified Davis as fleeing from the site of the newsstand immediately following the shooting of Feder, and the "girlfriend" of Davis to whom he had made post-facto statements indicating he committed the robbery. Davis cross-examined only four witnesses; three of these witnesses included the witness to the crimes, the doctor who performed the post-mortem on the victim, and a hospital technician who took a blood sample of the accused. His questioning was not extensive, although he did recall the doctor for further cross-examination after another witness had testified.

The Commonwealth also attempted to introduce testimony of witnesses to show Davis had a long-barreled .22 caliber pistol in his possession nineteen days prior to the shooting of Mr. Feder, and that this was the type of gun used in the Feder killing, but Davis' objection to this testimony was sustained by the court.

In addition, the Commonwealth attempted to introduce testimony to show Davis committed another robbery while armed with a long-barreled pistol "several blocks away" from the Feder newsstand just nine days before the Feder killing, but again the court excluded this testimony upon Davis' suggestion.

After the Commonwealth concluded its case, the trial judge excused the jury and proceeded to explain to Davis his rights to make an opening statement to the jury, to introduce his defense, and to submit a final argument to the jury.

After Davis indicated he would rest his case without making an opening statement or introducing any testimony, Mr. Chronister asked "for a few minutes to talk to Mr. Davis." This opportunity was given, and later at a conference in the court's chambers Davis went on to say, "Well, I've been arrested and I haven't yet been charged, because my name is not Benjamin Davis, and I have my military discharge that will state that my name is Franklin Davis and my social security number is not 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, it's 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."

After an extended discussion during which Davis verbally complained of the legality of his arrest and his extradition from New York, the trial resumed. Davis then proceeded, through Mr. Chronister, to introduce and make Davis' military discharge papers part of the record. After this, the district attorney made a motion to amend the indictment.

Davis made a short summation to the jury. The jury returned a verdict of guilty of murder of the first degree. Following this, the court once again directed his attention to Davis personally and said this:

"The Jury has now left the room. Mr. Davis, you now are in the situation where the Jury has returned a verdict of First Degree Murder, which will result either in a death sentence or life imprisonment. It's subject, of course, you [sic] rights of appeal, which we will explain later, but the point I want to make to you now is the very serious consequence we talked about before has come to pass, and I suggest you talk to Mr. Chronister, and you go back for lunch and think it through again, what you want him to do, or not to do. It remains your decision as we explained before.

"The issue now is quite different, there is a list of so-called aggravating circumstances in the law, and if the Jury finds that some of these are present and none of the

mitigating circumstances were present, and they come back and say that, then it is my obligation, under the law, to impose the death sentence. A number of these aggravating circumstances, obviously, aren't present here. Two of them are, that this specific killing occurred while in the perpetration of a felony, and undoubtedly the Commonwealth argue that that's the case in this situation. Another is that the victim was a witness to a felony, and that he was killed for the purpose of preventing his testimony. The Commonwealth may argue that, I don't know. There may be some other issues, but I suspect those will be the ones they will be pressing. If they are successful in having the Jury find that those are present, and no mitigating circumstances present, then the death sentence will follow. So you may want to give some thought to the mitigating circumstances and the one which might apply would be the 'age, lack of maturity, or youth of the actor at the time of the killing.' You may want to consider advancing that as a mitigating circumstance. If the Jury finds there is a mitigating circumstance, that's the end of it, then it's life and the death penalty is out of the case.

"Another mitigation is that the 'deceased participated or consented to the conduct' that would hardly be appropriate, and the last is that you were under some sort of duress. When I say hardly would be appropriate, you can advance any argument you wish, but I would certainly draw your attention to the age matter on the mitigating circumstances, and I would suggest you discuss this with counsel and reconsider what role you are to play and he should play. One of the reasons for taking the recess is not only for lunch, but to give you some time to reconsider the subject. We will reconvene, and the same will start promptly. The Commonwealth will put their evidence on, if they have any; and you can present your's [sic], if you have any. And each, of course, can argue the point, as I indicated, and we will Charge and then the Jury will go back in to consider it."

After lunch the court reconvened and immediately inquired if Davis wished to introduce any testimony "on the

subject of aggravation and mitigation." Davis said "no" and also declined an opportunity to say something further to the jury.

In the circumstances of this case, we cannot conclude that the trial judge erred in permitting Davis to represent himself. The record demonstrates that the judge fully advised Davis both of his right to be represented by counsel and of the possible disadvantages of self-representation; it also clearly shows that both Davis' waiver of the right to counsel and his assertion of the right to self-representation were knowing and deliberate choices. Cf. *Commonwealth v. Robinson,* 468 Pa. 575, 364 A.2d 665 (1976). Furthermore, the public defender was made fully available to Davis for whatever consultation and aid Davis might request. Hence, in these circumstances, it would have been constitutional error for the judge to have refused Davis his right to represent himself. *Faretta v. California,* supra.

The next assignment of error is that Mr. Chronister, the public defender, was ineffective and failed to perform his professional responsibility to Davis during the trial.[4] Under the circumstances, what more could Mr. Chronister do? To ask this question is to answer it.

The only remaining complaint requiring discussion involves the constitutionality of Section 1311 of the Sentencing Code of 1974, supra.[5] Since this Court has already disposed of this question and ruled that this legislation is unconstitutional as written, nothing further in regard to this issue need presently be said. See *Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977).

The sentence of death imposed on Davis in the trial court is vacated, and in its stead Davis is hereby sentenced to imprisonment for life.

4. There is nothing in the record to indicate that Davis conferred with or requested advice from Mr. Chronister other than that indicated in this opinion.

5. The evidence clearly supports a finding of murder of the first degree and the remaining assignments of error are devoid of merit.

NIX, J., concurs in the result.

MANDERINO, J., files a dissenting opinion.

MANDERINO, Justice, dissenting.

The majority is correct when it states that Davis had the right to conduct his own defense and waive his right to effective counsel. However, the decision to proceed without counsel must be made voluntarily, knowingly, and intelligently. These adjectives do not merely comprise a neat cliche; instead, they establish the criteria which must be met before we can find a valid waiver.

In this case, Davis clearly believed that he had a good defense based upon the fact that he was arrested under the wrong name. In a conference in the court's chambers, he stated, "Well, I've been arrested and I haven't yet been charged, because my name is not Benjamin Davis, and I have my military discharge that will state that my name is Franklin Davis and my social security is not 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, it's 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." Davis later introduced his military discharge papers and only made a short summation to the jury. Since Davis was permitted to defend himself with the mistaken notion that he did not have a good defense, there was no intelligent waiver. If Davis had chosen counsel and counsel had pursued this defense, such counsel would have been ineffective. To permit Davis to unwittingly so defend himself and label it a "waiver" is unconscionable.

I must dissent.