484 A.2d 1365

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Joseph Thomas SZUCHON, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 10, 1984.

Decided Nov. 20, 1984.

Reargument Denied Jan. 16, 1985.

230

Elliot J. Segel, Court-appointed, Erie, for appellant.

Michael J. Veshecco, Dist. Atty., Erie, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

On October 23, 1981, appellant Joseph Thomas Szuchon was found guilty by a jury of murder of the first degree, three counts of kidnapping, two counts of terroristic threats and two counts of recklessly endangering another person. In the penalty phase of the bifurcated proceeding conducted pursuant to the Sentencing Code, 42 Pa.C.S.A. § 9711, the same jury sentenced appellant to death for the murder of Judy Lynn Snyder.[1] Post-verdict motions were filed and denied by the Court of Common Pleas of Erie County and this automatic appeal followed. 42 Pa.C.S.A. §§ 9711(h)(1) and 722(4) and Pa.R.A.P. Rule 702(b).

The events culminating in an evening of terror on April 14, 1981 for three young people in Erie County began with

---

1. On May 3, 1983, appellant was sentenced by the trial judge to consecutive sentences on the other felony convictions ranging from ten to twenty years on the kidnapping convictions to one to two years on the reckless endangering. Appellant had also been charged with one count of criminal attempt to commit homicide for which he was acquitted.

the breakdown of appellant's relationship with Judy Lynn Snyder and his inability to deal with that breakdown. Appellant and Ms. Snyder had been involved in a stormy relationship over a period of several years, including periods of time in which they lived together in California and in Philadelphia. Toward the end of 1980, Ms. Snyder left appellant in Philadelphia and returned to her parents' home in Erie.

Refusing to accept that the relationship was over, appellant began to harass Ms. Snyder with telephone calls at her parents' home. Appellant's love for Judy Snyder progressively transformed to hatred and he began to tell various people how he was going to kill her with a Winchester rifle or cut her from ear to ear—if he could not have her, no one would. Eventually, appellant returned to Erie to pursue Ms. Snyder.

In Erie, appellant continued to harass Judy Snyder at her parents' home, with Erie police being dispatched to the home on two occasions to remove appellant from the premises. Appellant also continued to tell others that he intended to kill Ms. Snyder as well as her "boyfriend". Finally, on April 14, 1981, appellant purchased a Winchester rifle from Gorenflo's Gunsmith in Erie, purchased bullets from the Erie Sport Store, loaded the rifle and drove to the Bottom Line, a restaurant/tavern where Judy Snyder was working.

Appellant parked in the lot of the Bottom Line and read a newspaper while he waited for Ms. Snyder to get off work. When her shift was finished, she and two friends, Aldo DeSanto and Mary Sadowski, left the Bottom Line to go to Judy's car, whereupon the three were confronted by appellant, holding the Winchester and stating "If you all don't get into the car, I'll blow your fucking heads off." Notes of Testimony (N.T.) October 16, 1981 at 70 (testimony of Aldo DeSanto) and at 154–55 (testimony of Mary Sadowski). All four then got in Ms. Snyder's car with Judy driving, Mary in the front passenger seat, and Aldo in the back seat with appellant.

Appellant then directed Ms. Snyder to drive to an isolated area, the state game lands. As they drove, appellant kept the gun pointed at them and, at one point, told the three to "make your act of contrition or say your confessions if you want to go to heaven because at the end of this night I'm surely going to hell". *Id.* at 75 and 158–59. Mary Sadowski, certain she was going to die at appellant's hands, jumped from the moving car (at 50 m.p.h.) and escaped. *Id.* at 160. Somehow she avoided serious injury, ran to a house and called the police.

Appellant ordered Ms. Snyder to continue to drive to the game lands. Upon arrival there (the drive took approximately 15–20 minutes), he ordered her and Mr. DeSanto to walk into a corn field. The latter took several steps into the field, but Ms. Snyder refused. When she persisted in refusing to go on, appellant aimed the gun at Ms. Snyder, she turned, and appellant shot her in the back. Mr. DeSanto jumped to the ground, rolled, then got up and ran. While running, he heard two more shots. He finally reached a farmhouse and the owners called the police.

Shortly thereafter, Pennsylvania State Troopers arrived at the scene and discovered Ms. Snyder's abandoned car, and then located her body. She had been killed by two bullets that had pierced her back from different angles. Appellant was nowhere to be found, and a police manhunt was initiated.

Later that evening, Frederick Pusch was driving his vehicle on an isolated road south of Erie when he encountered appellant who informed Mr. Pusch that his car had broken down and that he needed to use a phone. Mr. Pusch drove appellant to Pusch's cottage at Canadohta Lake. While at the cottage, appellant informed Mr. Pusch that he had just killed his girlfriend and that another girl and a guy had gotten away. The next morning (April 15th), appellant placed a message with the Erie Police Department requesting that an officer with whom he was acquainted, Detective Richard Runstedler, come to Canadohta Lake so that he could turn himself in. Detective Runstedler and another

officer drove to Canadohta Lake and took appellant into their custody at approximately 12:15 p.m. on April 15, 1981.

Appellant was taken to the Erie City Police Department where, at approximately 1:30 p.m., Pennsylvania State Trooper Michael Povlick arrested him for the murder of Judy Lynn Snyder. Appellant was taken to the state police barracks where he was given his Miranda warnings, which he waived. Appellant then confessed to kidnapping the three victims at gunpoint, intending to take them to the country to kill them. Appellant stated that he intended to kill them because Judy would not return to him as his girlfriend, and because he perceived Aldo as "cutting in on him" and felt that Mary was meddling and interfering with his relationship with Judy. Appellant's version of the events was essentially consistent with the testimony of the two kidnap victims. Appellant told Trooper Povlick that he told Ms. Snyder "how much he loved her, and at this point she laughed and turned her back and he shot her." N.T. October 21, 1981 at 160. Appellant also informed Trooper Povlick that he had, the day of the homicide/kidnapping, ingested a "couple lines" of cocaine and "five to six quaalude tablets". *Id.* at 172. No evidence of drugs or paraphenalia were found on appellant.[2]

Appellant's defense was that he had been operating with a diminished capacity and/or had been in a drugged or intoxicated condition such that he was not able to form the

2. The Commonwealth also introduced a letter that appellant had written to Ms. Snyder's family while in jail awaiting trial. The letter read:

> To all you Snyder's: You's and your daughter lost respect and so did I and as nice as I tryed to be you's treated me wrong and the cost is a heavy one. So blame yourselfs also for not being wiser. If you's would have opened your hearts instead of closeing your door's she would still be with you's so you's killed her also. I do not respect any of you's for being such fools. And you's can now live with what has happened and never forget it. Its a shame that there are such foolish people such as you's who treat people like dirt who've never treated you wrong and always tried to help, but you can only hurt someone inside so much until the heart turns to stone and never forget that.

*Id.* at 124–25.

specific intent to commit murder. Thus the defense, for obvious reasons, did not deny that appellant committed the crimes, but attempted, rather, to reduce the degree of guilt on the homicide charge. The defense was unsuccessful.

The only evidence as to appellant's diminished capacity and his drugged or intoxicated condition came from appellant himself, through statements he had made to various people subsequent to the murder/kidnapping. This evidence was vague and equivocal and was overwhelmingly countered by the testimony of Aldo DeSanto, Mary Sadowski, Frederick Pusch (who was a teacher of the emotionally disturbed), the salesmen who sold appellant the rifle and bullets, the arresting officers and others, that on April 14 and 15, 1981, appellant was calm, deliberate and coherent and exhibited no signs of intoxication or drugged condition. Moreover, the Commonwealth introduced Dr. Walter Finken, a psychiatrist at Warren State Hospital who had examined appellant, discussed his participation in the crimes with him and testified that in his opinion, at the time of the incident appellant was able to comprehend the nature and the quality of his acts, knew right from wrong, and was capable of forming the specific intent to commit murder.

■ Based upon the foregoing discussion of the record evidence, we have no hesitation in finding that evidence sufficient beyond a reasonable doubt to sustain the jury's verdict of guilty of murder of the first degree, as well as the convictions for kidnapping, terroristic threats and reckless endangering.[3]

Immediately following the guilt phase of the proceeding, the penalty phase was conducted. No evidence was introduced by either party at this stage of the proceedings. The Commonwealth sought the death penalty on the theory that two aggravating circumstances existed which outweighed

3. Although not specifically raised in this appeal, this Court will always review the sufficiency of the evidence to sustain a conviction of murder of the first degree in capital punishment cases. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

any mitigating. The aggravating circumstances were: 1) that the appellant committed a killing while in the perpetration of a felony (kidnapping), 42 Pa.C.S.A. § 9711(d)(6); and 2) that in the commission of the offense the appellant knowingly created a grave risk of death to another person in addition to the victim of the offense, 42 Pa.C.S.A. § 9711(d)(7). The defense argued the existence of four mitigating circumstances, namely: appellant had no significant history of prior criminal convictions;[4] appellant was under the influence of extreme mental or emotional disturbance; appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and the influence of drugs and alcohol upon appellant's behavior. 42 Pa.C.S.A. § 9711(e)(1), (2), (3) and (8) respectively.

After being instructed by the court in accordance with the Sentencing Code, 42 Pa.C.S.A. § 9711(c), the jury unanimously returned a verdict of death having found both aggravating circumstances present and having found that the aggravating circumstances outweighed any mitigating circumstances.

Our standard of review in cases of murder of the first degree in which a verdict of death has been rendered is established by the Sentencing Code, 42 Pa.C.S.A. § 9711(h), which provides:

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

---

**4.** It was placed on the record that appellant entered a plea of guilty to a charge of robbery in 1974. The court, correctly, left it to the jury to determine whether or not this constituted a "significant history of prior criminal convictions."

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Before addressing appellant's specific challenges to the validity of his convictions and sentences, certain pre-trial events surrounding the court's appointment of counsel to represent appellant loom critical. Initially, appellant was represented by privately retained counsel who had entered his appearance on April 16, 1981. On September 24, 1981, a colloquy was held before the Honorable Richard L. Nygaard, the trial judge, at which private counsel, Jay Nedell, informed the court that his client had refused his advice to waive his right to a speedy trial (specifically embodied in the 180 day period of Rule 1100 of the Pennsylvania Rules of Criminal Procedure) in order to allow additional time to prepare the case. This colloquy originally had been scheduled with the understanding that appellant would execute such a waiver in writing, but he changed his mind based upon, as Mr. Nedell put it, "a little bit of a misconception of the law about the one hundred eighty day rule ...." N.T. Pre-trial colloquy September 24, 1981 at 2.

Several days later, another colloquy was held at which time the court granted Mr. Nedell's motion to withdraw as counsel because of a breakdown of the attorney-client relationship. Mr. Nedell indicated to the court that there was no communication between himself and his client, that his client had no trust in him and that his client was not cooperating with him in the preparation of the defense. Appellant stated he did not "give a damn" what attorney Nedell does, because Nedell did not see appellant as often as he had promised and because "He [Nedell] lied to me a few times." (There was no elaboration as to how counsel

"lied" to appellant.) When asked what plans he had regarding new counsel for his trial scheduled for October 12th, the final day of the 180 day period, appellant stated "I have to talk it over with my father. ... That is all I have to say about it." N.T. Pre-trial colloquy September 28, 1981 at 4. The following exchange then took place:

BY THE COURT: Mr. Szuchon, how quickly do you expect to be talking with your father?

BY THE DEFENDANT: Well, I guess as soon as I can make a phone call.

BY THE COURT: *Because as you are aware, with the one hundred eighty day rule, as we refer to it, the speedy trial rule not being waived by yourself, this will be going to trial beginning on October the 12th, and you must make your arrangements as quick as possible.* I'm going to grant this motion to withdraw, and I will await hearing from you perhaps through Mr. Nedell, if possible, as to what is happening as far as the appointment of other counsel to replace him, and if I don't hear anything within a day, I will be back in touch with both of you at that point, I think, so we have some line of communication from Mr. Szuchon to the Court. The motion is granted.

A third colloquy was held on Friday, October 2, 1981, at which appellant indicated he had not "had a chance to get in touch with" his father regarding retaining private counsel. N.T. October 2, 1981 at 2. Nevertheless, appellant refused the court's offer of court appointed counsel to either represent appellant at trial or to assist appellant in preparing his defense until such time as he did retain private counsel. *Id.* at 3, 11. The court strongly advised appellant to execute a waiver of Rule 1100, whether appellant be represented by private *or* appointed counsel, and went to great lengths to impress upon appellant the gravity of his decisions not to accept court appointed counsel and not to waive the 180 day rule. Appellant obstinately maintained "I'm not signing no waiver". *Id.* at 7, 8. The court then instructed appellant to continue to make every effort to secure an attorney and to

notify the court should appellant decide to accept court appointed counsel. Finally, a hearing was scheduled for the following Monday to determine whether appellant had been successful in retaining private counsel.

On Monday, October 5th, appellant stated in court that prison officials had refused to allow him to use a telephone and, so, he had not been able to contact his father. The court sent a court order to the jail instructing officials to permit appellant to make telephone calls. However, the court again strongly advised appellant:

that you give serious thought, whoever your attorney is, whether privately employed or court appointed, additional opportunity to prepare himself for the case and make use of expert testimony in your defense. *In your failure to waive that rule eleven hundred, timed deadline might hamper your attorney in preparing this defense. I realize the decision is yours, but the consequences are also yours should you fail to, and we are dealing here with a very serious charge and the consequences of which are all too serious as I'm sure you are aware.* I sent a couple of attorneys up who talked to you on Friday, I believe—Thursday or Friday. I will consult with them again and we can have somebody who is willing to step in at this late date and possibly step out if you employ somebody else in the meanwhile.

*Id.* at 2, 3. Later that afternoon, appellant again appeared before Judge Nygaard and again informed the court that he had not been permitted to make long-distance telephone calls. Judge Nygaard reiterated his order to prison officials and at that time appointed two attorneys, James Vogel and John Moore, both of whom had "extensive defense experience", to represent appellant at least until private counsel could be obtained.

The following day, October 6, 1981, yet another colloquy was held. At this colloquy, the warden of the Erie County jail appeared and refuted appellant's contention that he had been denied the use of the telephones. On the contrary, the warden stated that not only had appellant access to the

telephones, he had in fact made several calls including calls on September 28th, 30th, October 1st and others. The transcript contains the following discussion:

BY THE COURT: Mr. Szuchon, throughout all of these proceedings it has become abundantly clear to the Court that you are attempting to play games with the system. You have been offered the use of the phone, which you requested, and you have with the use of epithets refused what we have offered you. You are by your own actions hurting yourself. You are not hurting anyone else. You are hurting yourself. In this case, in your case, the discovery has not been completed, the psychiatric testing has not been done, no pretrial motions have been filed, *and yet you are refusing to cooperate with the attorneys who have been appointed to assist you by this Court.* A notice of an insanity defense has been filed, but no examination has been made, and yet you refuse to cooperate. I will grant an order which will permit a psychiatric examination of you. I'm not going to play games. If you don't want to go along with it, that is up to you. You will be tried on Monday. You are talking about hiring another lawyer. You have continued to talk about another lawyer. We have given you the use of the phone, and you, with the use of foul language, refuse and you won't cooperate with the two that I have appointed for you. *Everyday you refused to cooperate, and you make it more difficult to be represented. You make it difficult for yourself.* Nobody else except perhaps your attorneys who have a professional obligation and a personal interest in representing you. *Perhaps your lack of cooperation will make it impossible for you to be represented, and your own actions are causing this.* Not anybody else's. Nobody is doing this. You are doing it yourself. You failed to cooperate with them. If you failed to follow their advice, they can only sit with you and assist you in your defense. The role of your counsel shall be to represent you, if possible, but if they cannot because of your fooling around and playing games with them and us, they shall then be only required to sit with

you at the trial and advise you in your defense. *I want to ask you, do you realize the possible consequences of the trial you face on Monday?*

BY THE DEFENDANT: Yes, I realize it, and I realize that [the warden] is a liar.

BY THE COURT: *I will be absolutely clear and blunt with you. You may face either life imprisonment or you may face the death penalty. Do you realize that?* I don't know what else we can say to you on your behalf. You have been given the benefit of every turn of events, every opportunity in order to make sure that you have an attorney with you present at the time of your trial. *We have given you every opportunity, if you wish, to extend that period of time so that they will have more opportunity to represent you,* and I will add that if you hire another attorney, private outside counsel, I will expect to see him, and I'm sure he will be in here, if you follow his advice, requesting some more time. I'm sure that these attorneys who stand here with you today would like to have more time if you would only cooperate with them. *The decision is yours. Do you stand here again today refusing to waive your trial date on Monday?*

BY THE DEFENDANT: *That is right, Judge.*

BY THE COURT: Mr. Veshecco [the District Attorney], do you have anything else?

BY MR. VESHECCO: Nothing further except to concur with the Court's remarks and note for the record that Mr. Szuchon has chronologically taken advantage of the system, and if he wants a trial on Monday, fine, he is going to get a trial on Monday.

N.T. October 6, 1981 at 5–8.

Additionally, appointed counsel, Mr. Moore, conducted an on-the-record colloquy with appellant, as follows:

BY MR. MOORE: Your Honor, Mr. Vogel and I spoke to Mr. Szuchon earlier this afternoon. We were informed by him that pursuant to the order allowing him to make some phone calls from the Erie County Jail, he has been

in contact with his sister who has informed him that she or the Defendant's father will be retaining private counsel for him. Based upon that belief, Mr. Szuchon has declined to discuss this matter with Mr. Vogel and I with regards to our preparing a defense for the trial that is scheduled to begin Monday. I have advised Mr. Szuchon that Mr. Vogel and I will represent him at the trial if he does not have private counsel, and he has nevertheless declined to discuss the case with us.

\* \* \* \* \* \*

BY MR. MOORE: Your Honor, I would like to ask Mr. Szuchon a couple of questions.

BY THE COURT: Sure. Go ahead.

BY MR. MOORE: You heard me make a statement to the Court that you did not want to discuss this case with us; is that correct?

BY THE DEFENDANT: Not right now.

BY MR. MOORE: That is your position.

BY THE DEFENDANT: Right.

BY MR. MOORE: And do you understand any time you want to discuss this case with us we will be happy to meet with you?

BY THE DEFENDANT: Okay.

BY MR. MOORE: Do you understand we will come back and see you again tomorrow if you want to discuss this case?

BY THE DEFENDANT: All right.

BY MR. MOORE: Do you understand that if you do not have a private attorney representing you between now and Monday, that we will be your attorneys at the time of trial?

BY THE DEFENDANT: That is fine.

BY MR. MOORE: Okay.

*Id.* at 1, 9–10. Finally, the court appointed Dr. David Paul to conduct a psychiatric evaluation of appellant; appellant refused to submit to such evaluation. *Id.* at 10–11 and N.T. October 12, 1981 at 5.

On October 12, 1981, voir dire proceedings began at approximately 1:56 p.m. Preliminarily, attorney Moore placed the following on the record:

BY MR. MOORE: As we have previously informed the Court when we were originally assigned to represent Mr. Szuchon, approximately a week ago today, he informed us that he did not wish to speak to us regarding the case based upon the belief that he had at that time that his family would be retaining private counsel to represent him at trial. That conversation took place on Monday of last week. Subsequent to that conversation, we did contact Attorney Jay Nedell who had previously represented Mr. Szuchon who turned over to us his entire file, including various reports that were in it from Warren and/or reports from the District Attorney's Office, a copy of the transcript of the preliminary hearing, and certain research that he had done with regard to obtaining witnesses on Mr. Szuchon's behalf. Since that time, we have reviewed that file and we have attempted to reach certain of the witnesses and have in fact interviewed some of the witnesses at some length. *Mr. Szuchon informed us late last week, I believe Friday, that he would not have a private attorney representing him at this trial, and at that time he indicated that he would be willing for the first time to discuss the case with us.* We did have a lengthy discussion Friday afternoon involving Mr. Szuchon, Mr. Vogel, and myself, and Mr. Szuchon has not indicated to us any witnesses that he has asked to subpoena on his behalf. We have on our own initiative issued some subpoenas, and as I said, spoken to some of the witnesses. I believe that is all that I can tell the Court at this time.

BY THE COURT: Prior to the time the Defendant indicated his willingness to speak to you, did you have the benefit of reviewing the previous attorney's efforts in the defense of Mr. Szuchon?

BY MR. MOORE: Yes, we did, Your Honor.

N.T. October 12, 1981. District Attorney Veshecco then requested the court to, once again, question appellant on the record with regard to his court appointed counsel and his refusal to waive Rule 1100 despite the fact that the Commonwealth would seek the death penalty if the jury found appellant guilty of murder of the first degree, and the court responded:

BY THE COURT: It is my personal belief and professional belief that there has been a complete, and as a matter of fact, several colloquies on this very matter. *I will, however, ask of Mr. Szuchon whether or not he does wish to waive this right to a speedy trial, to continue the trial to some other date. Is that your wish or do you wish to go to trial now, Mr. Szuchon?*

BY MR. SZUCHON: *Go to trial now, Your Honor.*

BY THE COURT: You wish to go to trial, now. You say this even in light of the time limitations and the short length of time with which you have had to work with your attorneys. *Even in light of that, do you wish to go to trial now?*

BY MR. SZUCHON: *Yes, Your Honor.*

BY THE COURT: *Your answer was yes?*

BY MR. SZUCHON: *Yes.*

BY THE COURT: You are satisfied then, I assume, with the efforts and with the representation of these two court appointed attorneys up until this point.

BY MR. SUCHON: *I would like to have more time, Your Honor, but I'm not signing no waiver.* If you want to give me more time, I would appreciate that, but I ain't signing nothing.

BY THE COURT: Well, I wish you to know that the District Attorney, that the Court, and I'm sure your attorneys would permit you more time if you waive your right to go to trial now and decide that you rather would go to trial later, but as I hear you say, you want to go to trial now; is that correct?

BY MR. SZUCHON: You are over my one hundred eighty days, all right, as far as time goes.

BY THE COURT: In the Court's opinion, we are not over the one hundred eighty days and we'll be going to trial now unless you choose to waive that and continue the case.

BY MR. SZUCHON: *I'm not signing no waiver, Your Honor.*

BY THE COURT: Is there anything else to come to the attention of the Court?

BY MR. MOORE: Your Honor, I would like to ask Mr. Szuchon a question. Mr. Szuchon, you—

BY THE COURT: You may.

BY MR. MOORE: —you heard the statement I made to the Judge with regard to our discussing the case and preparing for trial last week.

BY MR. SZUCHON: Right.

BY MR. MOORE: Is everything I told the Judge, true?

BY MR. SZUCHON: Yeah.

BY MR. MOORE: Do you have anything else you want to add?

BY MR. SZUCHON: No.

BY MR. MOORE: Have we ever refused to meet with you or discuss the case with you?

BY MR. SZUCHON: No.

BY MR. MOORE: Have we done whatever you have asked us to do in preparing for this case?

BY MR. SZUCHON: I didn't ask you to do too much.

*Id.* at 12–14.

 Appointed counsel then made a motion to dismiss all charges against appellant for failure to comply with Rule 1100. The argument made was that "the one hundred eighty day period expired approximately forty-five minutes ago" since appellant's arrest had occurred at 1:30 in the afternoon of April 15, 1981. This frivolous motion was properly denied by the lower court. For purposes of Rule 1100, "trial shall be deemed to commence on *the date* the trial judge calls the case to trial . . . ." Pa.R.Crim.Pro.Rule 1100(b). The date the trial commenced was the 180th day

after appellant's arrest and it is of no moment that actual commencement of voir dire proceedings took place 180 days plus 45 minutes from the exact time of appellant's arrest. To accept appellant's premise would be to elevate technicality to high art; this we shall not do.[5]

██ Appellant now argues that the "short period of time" (one week) that court appointed counsel had "to prepare for both the guilt and penalty case is *per se* inadequate and violates a defendant's right to effective representation of counsel." Brief for Appellant at 69. In view of appellant's pre-trial conduct and decisions, this argument is obviously without merit. Just as a criminal defendant may knowingly and intelligently choose to waive his right to be represented by counsel, so too may a defendant knowingly and intelligently choose to proceed to trial represented by counsel who has had little or no time for preparation. In the latter case, the defendant must accept the consequences of counsel's lack of preparation.

██ Initially, it is clear that a defendant has the constitutionally guaranteed right to be represented by counsel of his own choosing. U.S. Const. amend. VI and Pa. Const. Art. I, § 9; *Commonwealth v. Robinson,* 468 Pa. 575, 592, 364 A.2d 665 (1976); *United States ex rel. Carey v. Rundle,* 409 F.2d 1210, 1215 (3d Cir.1969), *cert. denied* 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970). It is equally clear, however:

that a person's right to be represented by the counsel of his choice is not absolute. See, e.g., *Pirillo v. Takiff,* 462 Pa. 511, 341 A.2d 896 (1975). In *Moore v. Jamieson,* 451

5. Appellant's hypertechnical argument would work a particular injustice in the instant case since the record discloses that the Commonwealth was ready to proceed to trial on the morning of October 12, 1981 but that the court agreed to start the proceedings in the afternoon pursuant to request of appointed counsel.

Appellant also contends that "the lower court's failure to hold a hearing on [the Rule 1100] issue denied him his 6th and 14th Amendment rights to effective assistance of counsel and due process of law." Brief for appellant at 68. This argument is also frivolous as a court need not grant such a hearing when the 180 day period has not yet elapsed.

Pa. 299, 308, 306 A.2d 283, 288 (1973), this Court specifically held that the right of the accused to choose his own counsel, as well as a lawyer's right to choose his clients, must be weighed against and may be reasonably restricted by "the state's interest in the swift and efficient administration of criminal justice." Although the accused may personally elect to waive his right to a speedy trial, he clearly cannot be permitted to utilize his right to choose his own counsel so as *unreasonably* to clog the machinery of justice and hamper and delay the state in its efforts to do justice with regard both to him and to others whose rights to a speedy trial may thereby be affected. (citations omitted) The question thus becomes one of due process, and in the words of one court:

> "Due process demands that the defendant be afforded a fair opportunity to obtain the assistance of counsel of his own choice to prepare and conduct his defense. The constitutional mandate is satisfied so long as the accused is afforded a fair or reasonable opportunity to obtain particular counsel, and so long as there is no arbitrary action prohibiting the effective use of such counsel. The conclusion becomes inescapable, therefore, that although the right to counsel is absolute, there is no absolute right to a particular counsel." [Footnote omitted.]

*United States ex rel. Carey v. Rundle,* 409 F.2d 1210, 1215 (3d Cir.1969), cert. denied 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970).

*Commonwealth v. Robinson, supra* 468 Pa. at 592–93, 364 A.2d at 674; *see also Commonwealth v. Baines,* 480 Pa. 26, 389 A.2d 68 (1978).

■ By insisting on particular counsel who is unavailable or by insisting on private counsel but failing to take any steps to retain an attorney, a defendant may be deemed to have waived his right to have counsel of his choice. *Commonwealth v. Robinson, supra; Commonwealth v. Baines, supra; Commonwealth v. Wentz,* 280 Pa.Super. 427, 421 A.2d 796 (1980), appeal dismissed as improvidently

granted October 8, 1981. And, under such circumstances, a court may be justified in refusing to grant a request for a continuance which a defendant claims is necessary in order to allow him additional time within which to obtain counsel of his choosing. *Commonwealth v. Robinson, supra* 468 Pa. at 593–94, 364 A.2d at 675, *quoting Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *Commonwealth v. Wentz, supra.*

Of course, a criminal defendant also has a constitutional right to dispense with counsel altogether and to defend himself. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Commonwealth v. Davis,* 479 Pa. 274, 388 A.2d 324 (1978). This right to defend oneself holds true even in capital cases. *Commonwealth v. Davis, supra,* 479 Pa. at 277 n. 3, 388 A.2d at 325 n. 3. (It is strongly advisable, especially in a potential death penalty case, that the trial judge appoint "stand-by" counsel to assist a defendant to whatever extent the defendant permits. *See Commonwealth v. Africa,* 466 Pa. 603, 621 n. 18, 353 A.2d 855 (1976) *citing Mayberry v. Pennsylvania,* 400 U.S. 455, 468, 91 S.Ct. 499, 506, 27 L.Ed.2d 532 (1971) (Burger, C.J., concurring opinion.)) Naturally, the waiver of the right to counsel must appear from the record to be a knowing and intelligent decision made with full understanding of the consequences. *Faretta v. California, supra* 422 U.S. at 835, 95 S.Ct. at 2541 *citing Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Commonwealth v. Cathey,* 477 Pa. 446, 384 A.2d 589, 590 (1978).

Where a defendant knowingly and intelligently waives his right to counsel, or knowingly and intelligently refuses appointed counsel while insisting on privately retained counsel without taking steps to secure such private counsel, the defendant must be prepared to accept the consequences of his choice. *Commonwealth v. Strachan,* 460 Pa. 407, 333 A.2d 790 (1975); *Commonwealth v. Africa, supra; Commonwealth v. Davis, supra,* 479 Pa. at 479 Pa. 283, 388 A.2d 324; *Commonwealth v. Andrews,* 282 Pa.Su-

per. 115, 422 A.2d 855 (1980). As the United States Supreme Court stated, when "an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Faretta v. California, supra* at 422 U.S. 835, 95 S.Ct. 2541. So too, where a criminal defendant knowingly and intelligently refuses to take steps to secure private counsel, refuses court appointed counsel until one week before trial, refuses to cooperate with appointed counsel until several days before trial and refuses to waive his right to a speedy trial in order to allow counsel additional time to prepare a defense, that defendant "relinquishes ... many of the traditional benefits associated with the right to counsel" and must be prepared to accept the consequences of his stubborn obstinance.

In the instant case, the record makes it exceedingly clear that appellant knowingly and intelligently, and with full explanation and understanding of the consequences, insisted on his right to be tried, under Rule 1100, within 180 days of his arrest, thus deliberately forcing trial to commence on October 12, 1981. Being fully aware that court appointed counsel had only a limited time for preparation of his defense, appellant cannot be heard to bemoan the effectiveness of counsels' representation due to lack of preparation. Not only do we flatly reject appellant's *per se* ineffective assistance of counsel argument, we also shall not hold trial counsel to the usual expectations of effective representation in particular instances.[6] Rather, counsels' representation of appellant must be viewed in light of their lack of preparation time, a condition deliberately foisted upon them by appellant and attributed to him. Under these circumstances, only the most egregious instances of attorney error or ill-chosen strategy would warrant a finding that appellant was denied the effective assistance of counsel. To hold otherwise would create a situation wherein a defendant, by design, could build into his case ineffective assistance of

6. *See, e.g. Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977) *and Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967).

counsel claims, thus guaranteeing himself a basis for a new trial if the verdict were adverse to him.

In that light, we now review appellant's principal contention on appeal, namely, that some eleven prospective jurors were improperly challenged and excluded for cause and so he was denied his right to a trial by a fair and impartial jury selected from a representative cross section of the community, as mandated by the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Witherspoon* held that a sentence of death would be vacated where the state has excluded or excused prospective jurors from the venire simply for voicing general opposition to the death penalty or for expressing "conscientious or religious scruples" against its infliction. *Id.* at 522–23, 88 S.Ct. at 1777–78. The Illinois practice was found to have produced a jury "uncommonly willing to condemn a man to die" which, therefore, "fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments." *Id.* at 521, 518, 88 S.Ct. at 1776, 1775.[7] It was further stated that:

> nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would

---

7. The United States Supreme Court further stated:

> If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply "neutral" with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die.

*Id.* at 520–21, 88 S.Ct. at 1776.

prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* at 522, n. 21, 88 S.Ct. at 1777, n. 21.

■ In the instant case, our review of the record of the voir dire proceeding indicates that, contrary to appellant's assertion, five of the eleven prospective jurors now challenged were, in fact, properly excluded under *Witherspoon.* While the examination of these five jurors was not extensive, their responses to the prosecutor's questions indicated unequivocally that they would have automatically voted against the death penalty or that their attitude toward the death penalty would have prevented them from making an impartial decision as to appellant's guilt.[8] There were, however, six veniremen who may have been improperly excluded per *Witherspoon.*[9] Under ordinary .circumstanc-

8. Prospective jurors Russell, Fox and Ward were asked whether their conscientious scruples or beliefs against the death penalty would prevent them from imposing such penalty if the law and the facts dictated that result and these jurors responded, tersley but unambiguously, "Yes". N.T. Voir Dire October 12 and 13 at 62–63, 105–06, and 131–32, respectively. Prospective jurors Burke and Ward, while equivocating at first, subsequently made it unmistakably clear that their conscientious scruples and beliefs would prevent them from ever imposing the death penalty. *Id.* at 266–67 and 200, respectively.

9. These six were veniremen Buczek, Chalupczinski, Howard, Rexford, Settino and Dobruk. N.T. Voire Dire October 12 and 13 at 242, 174–75, October 14 at 22–24, October 15 and 16 at 7, 95–97, and 41–43 respectively. Because of our disposition of the *Witherspoon* issue on other grounds, however, we need not decide at this time whether some or all of these veniremen were improperly excluded. Accordingly, we need not determine the appropriate standard of review to apply to a trial court's exclusion of a juror for cause over an objection that the. juror is not properly "death qualified" under *Witherspoon.* We recognize, however, that the matter of the appropriate standard of review is a matter of some debate in the federal and state courts and ranges from the traditional broad discretion given to the lower court who observes the witness' demeanor to independent and strict review of the record with the requirement that there be no ambiguity at all on that record and with no deference to the trial court. *See Texas v. Mead,* —— U.S. ——, 104 S.Ct. 1318, 1320–24, 79 L.Ed.2d 714 (1984) and cases cited therein (opinion of Rehnquist, J., joined by Burger, C.J. and O'Connor, J., dissenting from denial of certiorari) ("Because of the substantial disarray among state and federal appellate courts as to the degree of deference, if any, due to a trial court's determination that a juror may be excluded for cause under *Witherspoon,* I would

es, improper exclusion of even one member of the venire in violation of *Witherspoon* requires the vacating of a sentence of death imposed by a jury selected from such a venire. *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (Per Curiam); *see also Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). These were not, however, ordinary circumstances.

The voir dire proceedings in the instant case were quite extensive and spanned five days. Both the district attorney and defense counsel were given wide latitude in the questioning of prospective jurors. Prior to commencement of voir dire, defense counsel contributed to and approved the formulation of the "death qualifying" questions to be asked the members of the venire. In each of the eleven instances that appellant now asserts were improper exclusions for cause under *Witherspoon,* defense counsel affirmatively indicated "no objection". In each of these eleven instances, defense counsel declined to ask follow up questions in an attempt to rehabilitate the veniremen by showing them to be able to obey their oaths and follow the court's instructions despite their opposition to the death penalty. However, in other instances either the court or defense counsel did ask such follow up questions to determine whether the prospective juror could obey their oaths and follow the law in spite of their attitudes and beliefs on the death penalty and other subjects.[10] Defense counsel was obviously satisfied that the veniremen whose exclusions are now challenged were properly excluded under *Witherspoon.* Additionally, the decision not to object to the challenge for cause of these veniremen nor to attempt to rehabilitate them through further questioning must be viewed as a tactical decision on the part of defense counsel. Accordingly, the issue of whether prospective jurors were

grant certiorari...." *Id.* 104 S.Ct. at 1320.) The United States Supreme Court has granted certiorari in a case which may resolve the issue of the appropriate standard of review. *Witt v. Wainwright,* 714 F.2d 1069 (11th Cir.1983), argued October 2, 1984. 36 Cr.L. 1007.

10. *See, e.g.,* veniremen Cline (N.T. October 12 at 141–45), Bailey (N.T. October 14 at 184–89) *and* Ruggerio (N.T. October 15 at 143–154).

improperly excluded under *Witherspoon* has been waived and cannot now be addressed for the first time on appeal.

■ Appellant maintains that a *Witherspoon* issue cannot be waived. We disagree. Since *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974) discarded the "basic and fundamental error" exception to the long-standing rule that errors not objected to at trial would not be reviewed on appeal, this Court has consistently found errors of constitutional dimension to have been waived. *See, e.g., In re Martorano*, 464 Pa. 66, 346 A.2d 22 (1975) (due process); *Commonwealth v. Bryant*, 461 Pa. 309, 336 A.2d 300 (1975) (illegal arrest and double jeopardy); *Commonwealth v. Jones*, 460 Pa. 713, 334 A.2d 601 (1975) (voluntariness of a confession/self-incrimination); *Commonwealth v. Roundtree*, 458 Pa. 351, 326 A.2d 285 (1974) (speedy trial). *Cf. Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976) (double jeopardy). In *Commonwealth v. Mitchell*, 464 Pa. 117, 124, 346 A.2d 48, 52 (1975), this Court reiterated the reasoning behind the *Clair* decision:

> Appellate Courts render a disservice to judicial economy and the efficient operation of our court system where they freely accept issues that could have and should have been first presented to the courts below for their consideration. (citations omitted) Such procedures encourage the reversal of many trials for errors which could have been, in all probability, avoided or cured if they had been promptly called to the attention of the lower court.

> Additionally, such a procedure not only deprives the reviewing court of the benefit of the reasoning of the lower court on the issues at hand but in many cases requires a decision of an issue on less than a complete record. Where parties below were not aware that a particular issue was being raised, it was quite likely that testimony germane to that issue would be overlooked or believed to be unnecessary and consequently not presented.

The concerns expressed in *Mitchell* are particularly acute in the instant case. The prosecutor, trial court and defense

counsel, who were in a position to observe the veniremen, their responses to questions, their demeanor, sincerity, tenor of voice, etc. (in short, the full panoply of sensory data that contributes to the observer's perceptions and assessment of a persons credibility), felt the need in several instances to delve at greater length into prospective juror's attitudes and beliefs regarding capital punishment. The prosecutor, trial court and defense counsel were satisfied that each of the veniremen whose exclusion is now challenged by appellant were properly excluded under *Witherspoon*. Accordingly, as defense counsel did not exercise the right to further examine these veniremen nor object to their exclusion for cause, the lower court was denied the opportunity to cure any alleged *Witherspoon* defect in the voir dire proceedings, as it did in several instances. Moreover, this Court is deprived of the benefit of the observations of the participants below and of the reasoning of the lower court. Finally, had defense counsel objected to the exclusion for cause of the six prospective jurors whose exclusion over objection may have violated *Witherspoon*, and had the court sustained such an objection, the district attorney could have exercised one of his remaining seven peremptory challenges to exclude each such juror.

For all of the foregoing reasons, we hold that the *Witherspoon* issue has been waived and appellant is precluded from raising that issue on appeal.[11]

▮▮▮ Appellant further argues that the *Witherspoon* issue is presented for appellate review due to the asserted ineffectiveness of trial counsel in failing to object to the exclusion of the veniremen or to attempt to rehabilitate them by additional questioning.[12] As we have previously stated, however, we shall not hold defense counsel in this case to the usual standards and expectations of effectiveness because of appellant's deliberate choice which forced

11. This issue is also waived for failure to include it in post-verdict motions. *Commonwealth v. Blair,* 460 Pa. 31, 331 A.2d 213 (1975) *and Commonwealth v. Hagans,* 483 Pa. 415, 397 A.2d 412 (1979).

12. Appellant is represented by new counsel on appeal.

counsel to proceed to trial on one week's preparation. Our review of the 715 pages of transcript of the voir dire proceedings discloses vigorous and extensive questioning of veniremen by defense counsel which resulted in the selection of a fair and impartial jury able to follow and apply the law not only on the death penalty but also on "defense" issues such as intoxication, the defendant's right to remain silent and diminished capacity. Whether or not counsels' representation would have been deemed effective under ordinary circumstances, their representation of appellant under these difficult circumstances is constitutionally acceptable. Any possible deficiencies in the representation of appellant at voir dire are the consequences of appellant's knowing and intelligent decision to proceed to trial on October 12, 1981.

In a related argument, appellant argues that even if all of the veniremen were properly excluded under *Witherspoon*, the "death-qualification" of a jury produces a "prosecution-prone" jury uncommonly willing to convict a defendant in the first instance. This argument was made and rejected in *Witherspoon* because the United States Supreme Court found the data compiled to that point "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." 391 U.S. at 517. Appellant claims that the scientific and sociological surveys and data currently available have now conclusively established the "prosecution-proneness" of "death-qualified" juries and asks this Court to take judicial notice of this data to find his conviction impermissibly tainted. This we decline to do, as we have consistently done in the past. *Commonwealth v. Story*, 497 Pa. 273, 287–92, 440 A.2d 488 (1981) (Larsen, J. Dissenting); *see also Commonwealth v. Roach*, 444 Pa. 368, 282 A.2d 382 (1971) *and Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309, 1316 (1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 370, 82 L.Ed.2d —— (1984). Appellant has made no showing on the record that the process of "death-qualifying" a jury tainted his conviction in any way,

and his "judicial notice" concept must be rejected—such "a loose concept of 'judicial notice' would make a mockery of the adversary system...." *Commonwealth v. Story, supra* at 497 Pa. 289, 440 A.2d 488 (Larsen, J. dissenting).[13]

 Appellant alternatively asserts that counsel was ineffective in failing to "make a record" regarding the prosecution-proneness of "death-qualified" juries,. and so asks this Court to remand the case for an evidentiary hearing to allow new counsel an opportunity to present evidence in support of such theory. Again, appellant's own deliberate choice to proceed to trial with counsel appointed only one week prior precluded any possibility of presenting such evidence to the lower court. Appellant must accept the consequences of his knowing and intelligent choice; this ineffective assistance of counsel argument must therefore be rejected.[14]

13. That the data remains too tentative and fragmentary to permit an appellate court to judicially notice that "death-qualified" juries are impermissibly prosecution-prone is demonstrated by the fact that, of the reported cases that have exhaustively analyzed the data following full evidentiary hearings, our research has discovered only one case in which a conviction has been overturned on the basis of that data. *Grigsby v. Mabry,* 569 F.Supp. 1273 (E.D.Ark.1983), on remand from Eight Circuit, 637 F.2d 525 (8th Cir.1980). *But cf. Keeten v. Garrison,* 742 F.2d 129 (4th Cir.1984) reversing the decision of the federal district court; *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978); *Hovey v. Superior Court of Alameda Co.,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980).

14. Appellant also asserts numerous other instances of error at both the trial and penalty phase of the proceedings. These assertions of error are: (1) the court erred in ordering appellant shackled to counsel table following an incident wherein appellant attacked a Commonwealth witness after the witness had testified; (2) the court erred in refusing to declare a mistrial due to the "hostile courtroom atmosphere" allegedly created by that incident and two other incidents wherein certain comments concerning appellant were made in passing by unidentified persons outside of the courthouse and overheard by several of the jurors; (3) the court erred in overruling objections to certain remarks made by the prosecutor in his opening and closing statements; (4) the court erred in admitting photographs of the victim's body; (5) the court erred in admitting, over objection, inculpatory statements made by appellant to various witnesses prior to the homicide; (6) the court erred in its instructions to the jury concerning the aggravating and mitigating circumstances; and (7) the court erred in refusing counsel's request that the defense be permitted to make the

■ Finally, as required by statute, we have examined the record of all pre-trial, trial and penalty phase proceedings and have determined that the evidence overwhelmingly supports the finding of the aggravating circumstances (killing while in the perpetration of a felony and knowingly creating a grave risk of death to another person in addition to the murder victim. 42 Pa.C.S.A. § 9711(d)(6) and (7)) and that the sentence of death was compelled by the facts and circumstances demonstrated by the Commonwealth and was not the product of passion, prejudice or any other arbitrary factor. 42 Pa.C.S.A. § 9711(h)(3)(ii) and (i). We are also obliged to determine whether the sentence of death imposed in the instant case is "excessive or disproportionate to the penalty imposed in similar cases...." 42 Pa.C.S.A. § 9711(h)(3)(iii). We have reviewed the data and information pertaining to similar cases that has been compiled by the Administrative Office of Pennsylvania Courts pursuant to this Court's directive. *See Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700, 707–08 (1984), *cert. denied* — U.S. —, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Our review of that data discloses that the sentence of death is neither excessive nor disproportionate to that imposed in similar cases. *See Commonwealth v. Stoyko,* 504 Pa. 455, 475 A.2d 714, 724 (1984), *cert. denied* — U.S. —, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984).

For the foregoing reasons, we sustain all of the convictions and affirm the sentence of death for the conviction for murder of the first degree and the judgments of sentence of imprisonment for the remaining convictions.[15]

ZAPPALA, J., concurred in the result.

NIX, C.J., filed a dissenting opinion.

final closing argument in the penalty phase. We have examined these issues and find them to be without merit.

15. The prothonotary of the Western District is directed to transmit to the Governor, as soon as possible, the full and complete record of all proceedings below and of review by this Court. 42 Pa.C.S.A. § 9711(i).

NIX, Chief Justice, dissenting.

I am constrained to reiterate my dissent from the majority's conclusion that death-qualified juries are not conviction prone. As I stated in my dissenting opinion in *Commonwealth v. Maxwell*, 505 Pa. 152, 172, 477 A.2d 1309, 1319, *cert. denied*, —— U.S. ——, 105 S.Ct. 370, 82 L.Ed.2d —— (1984), "... studies now demonstrate convincingly that persons favoring the death penalty are significantly more likely to vote for conviction in capital cases and that persons excluded from jury service on the basis of their unwillingness to impose the death penalty represent a distinct and sizeable group of the community." *Id.*, 505 Pa. at 172, 477 A.2d at 1319. Thus I believe that the defendant's right to trial by an impartial jury selected from a representative cross-section of the community has been violated by the death qualification process because this process "produces juries that are both prosecution prone and unrepresentative." *Id.*, 505 Pa. at 172, 477 A.2d at 1319. Therefore, I dissent.

Further, even assuming the continued efficacy of the death-qualification process, the record reveals that trial counsel failed to object to the prosecution's challenge for cause of several potential jurors whose testimony did not establish their excludability under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Trial counsel made no attempt to rehabilitate these challenged veniremen through further questioning as to their ability to return a verdict of death where the evidence called for such a verdict.

While I am inclined to agree with the majority that appellant's naive pre-trial tactics should be considered in an evaluation of counsel's stewardship, those actions on the part of appellant cannot be deemed in any way to justify counsel's omissions during the selection of the jury proceedings. Lack of preparation time is irrelevant to trial counsel's ability to respond to a prosecutorial challenge to a venireman on *Witherspoon* grounds; all that is demanded of counsel in such situations is a knowledge of the law. For

that reason I am convinced that our normal test of steward-ship, whether counsel's actions had a reasonable basis designed to effectuate the interests of his client, should be applied. I would in the alternative remand for an evidentiary hearing to determine trial counsel's reasons for not objecting to the exclusion of the veniremen in question.