490 A.2d 811

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Martin A. COLSON, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1984.

Decided April 4, 1985.

442

444

Mel D. Kardos, Newtown, for appellant.

Michael J. Kane, Dist. Atty., Robert E. Goldman, Chief/Deputy Dist. Atty., Stephen B. Harris, First Asst. Dist. Atty., Doylestown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

ZAPPALA, Justice.

Appellant, Martin Colson, appeals a judgment of sentence of death for murder of the first degree imposed by the Court of Common Pleas of Bucks County.

The Commonwealth's evidence established that decedent, Thomas Livezey, resided in Fountainville, Bucks County, and was involved in various business enterprises. Among other things, he was a painting contractor. On November 15, 1976, decedent received a call at home from a woman who identified herself as Melinda Kelly. The caller said she wanted an estimate for a painting job at a house into which she was about to move. Decedent referred her to his wife, Barbara Livezey. She took directions from the caller to a purported job site in Upper Bucks County. It was agreed that decedent would go to the site the following Saturday morning, November 20.

Decedent left home in a van on the morning of November 20. He and the van were next seen by passing motorists on Keystone Road in Upper Bucks County. Two of the motorists who stopped at the scene were Donald Landis and Frank Smolinsky. They observed the van parked with the door open and decedent lying on the road near the van. Landis had heard gunshots shortly before. State Trooper Thomas Stotsenburgh arrived at the scene and found decedent dead of gunshot wounds. There were shotgun wadding and shells near the body. Stotsenburgh found a clipboard with directions to the purported job site. The street on which the job was to be done did not exist.

After the killing, it was learned through investigation that decedent was a partner in real estate ventures with his brother, William, and that each of them held large insurance policies on the life of the other. The business was in debt, which led to disputes between the brothers. Early in

1976, decedent offered his brother $4,000 for his interest, which was refused. Decedent initiated legal proceedings to dissolve the partnership, which were in progress at the time of his death. The homicide made William the sole owner of the business. The business received $237,000 in life insurance proceeds. Debts were paid, and William netted $100,000.

William Livezey and Appellant were linked to the homicide by Jerome Randis, who spoke to the State Police on March 22, 1979. Randis said that he was associated with Livezey and Appellant in the drug business. He was present at or party to conversations in which they spoke of their involvement in the killing. On one occasion after the killing, Livezey and Appellant discussed the killing and Appellant said he wanted money for it. During conversations between Appellant and Randis, Appellant said that he arranged to have decedent lured to the scene of the killing, that he shot decedent with a shotgun obtained from William Livezey, and that he then threw the shotgun into the Delaware river. Randis was present on another occasion when Appellant told a third person he did a "hit" for William Livezey. On still another occasion, Livezey told Randis he arranged to have Appellant kill decedent. A further link was provided by Daniel Thurber, another associate of Appellant. Thurber was with Appellant in Florida after the killing. He testified that Appellant told him he "shot a guy in Pennsylvania," was paid for it, and threw the weapon in a river.

After Randis revealed his information, Barbara Livezey participated in a telephone "lineup" under the supervision of the State Police. She heard eight women speak over the telephone and identified one of them as the caller who directed decedent to the scene of the homicide. The woman she identified was Eva Colson, the wife of Appellant. Shortly after the "lineup", Eva Colson left her residence, and according to the testimony of a state trooper at trial, she had not been located thereafter.

In December 1978, William Livezey went to the office of James Hansley, Police Chief of the Borough of Lansdale, Montgomery County to pay some traffic fines. Hansley had been acquainted with both Livezey and decedent. He told Livezey he was a suspect in the murder on the basis of what was then known about his business dealings. Livezey said he had discussed the matter with the State Police and had been advised by his attorney not to say anything. On February 20, 1979, Hansley learned that there were warrants outstanding for Livezey's arrest on drug charges. He attempted to locate Livezey and was not able to do so. Livezey's whereabouts were unknown until September 17, 1979, when police were called to a residence in Lansdale where a disturbance was going on. Livezey's girlfriend, Barbara Kelly came out of the residence. She said that Livezey was inside, had a gun, and was determined not to be taken alive. Hansley attempted to persuade Livezey to come out. When this failed, tear gas canisters were thrown into the residence. One canister came into contact with a curtain on a window and started a fire. Police entered the residence after the fire was put out and found Livezey dead of a self-inflicted bullet wound in the head.

■ Appellant claims to have been denied due process of law by delay in his arrest. Such claim, if accepted, would entitle him to a discharge. Appellant was arrested on February 20, 1980, which was more than three years after the crime. He argues that this was unfair because certain potential defense witnesses were dead or could not be located, those who could be located no longer had independent recollections of events, and Appellant himself no longer had a clear memory of events at the time of the murder. A state trooper gave reasons for the delay at a pre-trial hearing on this issue. The State Police did not believe they had probable cause to make any arrests until they spoke to Jerome Randis. After that, they determined that William Livezey and Martin and Eva Colson should be arrested. They desired to locate and arrest all three at the same time, fearing that if one were arrested, the other two would go

into hiding. They found that they were unable to locate any of the suspects in the Commonwealth. The State Police had information indicating that Appellant was in Wisconsin and Florida at different times. They followed leads in those states. Appellant was ultimately located and arrested in Tampa, Florida.

In *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Court addressed the question of delay in the filing of charges, which raises issues similar to those involved in a delayed arrest. The court held that proof of prejudice is a necessary, but not sufficient, condition for a finding of denial of due process. The prosecution is under no constitutional duty to file charges as soon as it obtains sufficient evidence to establish probable cause or prove guilt. It may delay doing so in order to continue its investigation. A delay for a reasonable investigation does not violate due process even if it adversely affects the defendant's case. *Lovasco* involved an eighteen month delay in the filing of federal firearms charges. The delay was due to an investigation conducted for the purpose of finding co-conspirators. The Court determined that the delay for such purpose was reasonable. Consequently there was no denial of due process.

*Commonwealth v. Crawford*, 468 Pa. 565, 364 A.2d 660 (1976), involved a murder prosecution. We found that a four year delay in the filing of charges did not deny due process where the police had difficulty putting together the facts and the defendant was put on notice at the time of the murder that he was a suspect. A seven month delay in the arrest of a rape defendant did not deny due process where the police made reasonable efforts to locate him at the residences of relatives and at various hangouts, *Commonwealth v. Sanders*, 260 Pa.Super. 358, 394 A.2d 591 (1978). In the instant case, although Appellant claims he was prejudiced, there is no evidence to support that contention. He appears to have had notice that he was a suspect, given his departure from the Commonwealth and the testimony of his statements that he committed the murder. The pre-ar-

rest delay was reasonable in view of the initial difficulty experienced by the police in ascertaining the facts, Appellant's absence from the Commonwealth, and the diligent efforts to locate all of the suspects. Therefore, we find no denial of due process.

■■■■ Appellant asserts various grounds for a new trial. One of these is that the jury was improperly death qualified. Prospective jurors who stated that they would not under any circumstances vote for the death penalty were excluded. Appellant argues that this was improper because it resulted in a jury that was more conviction-prone and did not contain a representative cross-section of the community. The death qualification procedure followed here was approved in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Similarly, we have held that death qualification does not deprive the defendant of a fair determination of guilt or innocence, *Commonwealth v. Maxwell,* 505 Pa. 152, 477 A.2d 1309 (1984); *Commonwealth v. Brown,* 462 Pa. 578, 342 A.2d 84 (1975). See also, *Commonwealth v. Travaglia,* 502 Pa. 474, 503 n. 2, 467 A.2d 288, 302–03 n. 2 (1983).

■■■ Appellant also argues that death qualification was improper because this should not have been treated as a capital case. The argument is based on the fact that he was accused of committing a murder prior to the enactment of the present death penalty statute, Act of September 13, 1978, P.L. 756, No. 141, effective immediately, 42 Pa.C.S. § 9711. We have held that this is not a ground for a new trial, *Commonwealth v. Story,* 497 Pa. 273, 440 A.2d 488 (1981).

■■■ Appellant alleges several errors in the jury selection process. One of these is the refusal to excuse for cause Barbara Funk, a prospective juror who had ties to the victim's and prosecutor's families and prosecution witnesses. Funk knew decedent's mother, who had taught her son in school approximately four years before the trial, and was acquainted with Frank Smolinsky, one of the motorists who

had discovered the decedent's van, and with the wife of the state trooper who was the prosecuting officer. She did not have a close relationship with any of these people. Furthermore, Funk believed that her husband may have been employed by decedent as an electrical subcontractor prior to their marriage. Also, her mother's estate had been settled four years previously by an attorney who was associated with the prosecutor's father. She did not know the prosecutor. Funk testified that none of these relationships would influence her decision.

■■■ The test for determining whether a prospective juror should be disqualified is whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor, *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973). It must be determined whether any biases or prejudices can be put aside on proper instruction of the court, *Commonwealth v. Drew*, 500 Pa. 585, 459 A.2d 318 (1983). A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to questions, *Commonwealth v. Colon*, 223 Pa.Super. 202, 299 A.2d 326 (1972). The decision on whether to disqualify is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion, *Commonwealth v. Black*, 474 Pa. 47, 376 A.2d 627 (1977).

■■■ A remote relationship to an involved party is not a basis for disqualification where a prospective juror indicates during voir dire that he or she will not be prejudiced. This is illustrated by a number of cases. One of these is *Commonwealth ex rel. Fletcher v. Cavell*, 395 Pa. 134, 149 A.2d 434 (1959). That case involved challenges to two prospective jurors in a murder trial. One of them was the son-in-law of a detective who investigated the crime. The

other was a second cousin once removed to the victim. She testified that she and the victim lived twenty-five miles apart and never visited each other. We found no error in not disqualifying these jurors. In *Commonwealth v. Yohn*, 271 Pa.Super. 537, 414 A.2d 383 (1979), the court upheld the refusal to disqualify two jurors in a burglary case. One of them had been employed by the victim three or four years before the crime. The other had gone on a fishing trip six to eight years before the trial with a police officer who was the superior of the prosecuting officer. No basis for a challenge for cause of a prospective juror was found in *Commonwealth v. Bright*, 279 Pa.Super. 1, 420 A.2d 714 (1980), a prosecution for assault and resisting arrest, where the juror lived in the same neighborhood as the prosecuting attorney and had known him since he was a child. There was likewise no ground for challenging a prospective juror in a theft and receiving stolen goods prosecution where she was somehow related to the police prosecutor (the record did not disclose how) and was the aunt of a member of the district attorney's staff who was not trying the case. *Commonwealth v. Stamm*, 286 Pa.Super. 409, 429 A.2d 4 (1981).

Cases involving issues of juror bias that arose during the trial are also relevant. We found no basis for disqualifying a juror who recognized the mother of a murder victim when she took the stand but said she did not know her and felt no more sympathy for her than she would for anyone else in the same situation, *Commonwealth v. Carter*, 444 Pa. 405, 282 A.2d 375 (1971). In *Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980), another murder case, there was no need to disqualify a juror who recognized a police witness as someone she had seen at mass but said she did not know his name, had never spoken to him, and would not be influenced.

In the instant case, we find that Funk's relationship to persons involved in the case was remote. It did not create such a bias as to require her disqualification. Consequently, there was no error in refusing a challenge for cause.

 Appellant next claims that it was error to refuse challenges to two prospective jurors who expressed a bias in favor of police witnesses. One of them testified as follows under voir dire questioning by the defense attorney:

Q. If two people testified in this matter and one happened to be a police officer and one happened to be a private citizen and they both had the same opportunity to observe the same event. In other words, they had the same amount of time to observe something from the same distance and one person testified one way and that was the civilian witness and the police officer testified a different way, would you tend to believe the police officer because he is a police officer as opposed to the civilian witness?

A. I would believe the police officer, yes.

Q. Simply because he is a police officer I assume?

A. Well, primarily.

The prosecutor questioned him further on the subject:

Q. If a civilian witness and a police officer both have the training and the same education and the same background they are identical in all those respects, would you be able to evaluate them in the same way and listen to what they base their opinion upon?

A. Yes, I would be able to evaluate.

THE COURT: You would be able to evaluate them?

THE WITNESS: Yes.

* * * * * *

Q. You would be able to then evaluate both according to—what I'm saying is that the Commonwealth will tell you and the Judge will instruct you later that just because a person is a police officer, you listen to what he bases his observations upon, do you feel you would be able to evaluate his testimony like you evaluate all people or all civilian witnesses' testimony?

A. Yes.

* * * * * *

THE COURT: Mr. Johnson these questions are designed to determine whether or not you have bias in favor of or against the police officers?

THE WITNESS: No, no, that wasn't the reason for my yes. I mean before that I would believe a police—I just think, I mean it is their job. I don't know.

THE COURT: It has to do with the amount of training and fact background and experience?

THE WITNESS: More that type.

THE COURT: All right.

\* \* \* \* \* \*

Q. Like I said, Judge Rufe will tell the jurors at the end of this case certain ways that they can evaluate testimony.

Do you feel you would be able to accept the instructions that His Honor, Judge Rufe gives to you regarding that evaluation?

A. Yes.

The other venireperson in question responded to the defense attorney's questions as follows:

Q. Would you believe the police officer over the civilian witness solely because he was a police officer?

A. Not necessarily.

Q. I am not sure I understand your answer.

A. Just because he would be a police officer, maybe I wouldn't take his part just because he is an officer.

Q. Would you tend to believe him simply because he is a police officer?

A. I probably would yes. I would tend to, yes.

Q. Mrs. Daniels, one of the instructions that Judge Rufe will give to you is that you, as a juror, must evaluate everyone's testimony and civilian witness, police witness, whatever their background is, you must evaluate witnesses and the Judge will give you some guidlines [sic] as to how to determine credibility of witnesses.

Now, the Judge, will also tell you that all witnesses are judged the same.

Do you feel that, I believe you said that it would depend on—there was a question about you would believe a police officer solely because he was a police officer and you indicated no, it depends.

A. No, I would not believe him just because he was a police officer. I wouldn't indicate that I would believe him solely because of that.

Q. Mrs. Daniels, would you be able to instruct Judge Rufe's instructions of law on all matters in this case?

A. I think so.

Both venirepersons' answers initially indicated a bias toward police officers. Their answers to further questions made it reasonable to find that they would evaluate all witnesses fairly and without prejudice and would follow the instructions of the court. There was no abuse of discretion in refusing challenges for cause.

■ Appellant also claims that it was error to refuse to disqualify one Geiger (first name not in record), a venireperson who had been robbed at gunpoint while working at a gas station, was acquainted with some police officers, had read about the crime in the newspaper, and recognized the names of two potential Commonwealth witnesses. One of the prospective witnesses was Jeff Burley, who did not testify. Burley had been a childhood acquaintance of Geiger's cousin. Geiger was aware of that acquaintanceship but did not himself know Burley. The other witness was Chief Hansley. Geiger knew of Hansley because he resided in the same area. He did not know Hansley personally and had never had any dealings with him. Geiger said he would be able to evaluate both witnesses' testimony the same as anyone else's. In view of that testimony and the remoteness of the relationships, we find no basis for disqualification. Geiger knew a number of police officers from having previously worked in the security field. He testified that he would not be biased in favor of police witnesses and his verdict would not be influenced. He also testified that he would not be influenced by his having been a robbery victim. We find no basis for not accepting that testimony.

Geiger read an article about the case in the newspaper shortly before the trial. He learned the names of Appellant, decedent, and decedent's brother. He learned that decedent's brother committed suicide in a house where the police were trying to arrest him and that there was a fire at the house. He said that his verdict would not be affected. We do not find his knowledge to have been so significant as to prevent him from rendering a fair verdict. Consequently, we find no abuse of discretion in refusing the challenge for cause.

 Appellant next claims that the court misapplied the *Witherspoon* rule to exclude two prospective jurors who were not irrevocably committed to vote against the death penalty. One venireperson, when asked about the death penalty, testified as follows:

Q. If you found after listening to the facts in this case that there was aggrivating [sic] circumstances in this case and no mitigating circumstances, the judge will tell you the sentence must be death.

Now, would you be able to come back with a decision of the death penalty?

A. No.

He gave the following testimony in response to further questioning on the subject:

Are you against the death penalty in all circumstances?

A. Not in all circumstances.

Q. When do you feel it is appropriate?

A. When do I feel—

Q. When do you feel that you could impose the death penalty?

A. In the instance of a child being involved or something like this.

The instant case did not involve a child. The testimony indicated that the prospective juror could not vote for the death penalty under the facts of the case and would not follow the court's instructions. Therefore, he was properly

460

excluded. The testimony of the other venireperson was as follows:

> Q. Now, in this case the District Attorney is seeking a conviction in murder of the first degree and if the verdict is murder in the first degree, and he is found by the jury to be guilty of murder in the first degree, you would then be asked to deliberate a second time to decide whether or not life imprisonment or the death penalty should be imposed and do you have any moral, philosophical or religious scruples that prohibit yuu [sic] from imposing the death penalty if the circumstances warrant it?
>
> A. Yes, I would think so.
>
> Q. What are those if I might ask?
>
> A. Well I don't think he should be put to death. I don't believe in capital punishment I guess.
>
> Q. Is that in all circumstances or just in some?
>
> A. I guess all.
>
> Q. Can you think of any instances where you would think capital punishment might be justified?
>
> A. No, no I don't think so.

That testimony established an irrevocable commitment to vote against the death penalty. *Witherspoon* was applicable and the exclusion was proper. *See also Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ("clarifying" *Witherspoon* and stating standard as whether juror's views would prevent or substantially impair performance of duties as juror in accordance with instructions and oath).

▪▪▪ Appellant claims that he was improperly prevented from addressing the following question to prospective jurors:

> Would you be able to allow the death penalty for a group of terrorists who killed hundreds of thousands of people when they blew up (hypothetically) the World Trade Center in New York, showed no remorse, and if released from jail that they vowed to do the same thing again? They further anticipate being released because of a future hostage or kidnapping situation.

The scope of voir dire examination is in the sound discretion of the trial judge, *Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977). There was no abuse of discretion. The question referred to a fact situation that was not involved in the instant case and was therefore irrelevant.

■ Appellant's final claim in regard to jury selection is that the court erred in refusing to allow him peremptory challenges in addition to the twenty allotted, Rule of Criminal Procedure 1126(a)(3). Appellant exhausted his peremptory challenges. He claims to have been forced to do so because of the court's erroneous refusal of his challenges for cause. We have determined that the challenges were properly refused. Moreover, the trial court does not have the power to allow more than the allotted number of peremptory challenges, *Commonwealth v. Edwards*, 493 Pa. 281, 426 A.2d 550 (1981).

■ Appellant's next argument is that the court wrongly denied him permission to act as co-counsel. He was represented by an attorney. A defendant has the constitutional right to proceed without counsel if the decision to do so is knowing and voluntary, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), accord, *Commonwealth v. Davis*, 479 Pa. 274, 388 A.2d 324 (1978). In *Commonwealth v. Williams*, 270 Pa.Super. 27, 410 A.2d 880 (1979), the court held that the same constitutional right does not apply to a defendant represented by an attorney who wishes to act as co-counsel and that the decision as to whether that is to be allowed is in the sound discretion of the trial court. We agree and see no basis for a finding of abuse of discretion in the instant case.

■ Appellant claims that the trial court improperly refused to conduct an in camera inspection of the Commonwealth's case file. The defense requested the inspection so that it would be determined whether the file contained undisclosed evidence that would tend to exculpate Appellant. In order to comply with the requirement of due process of law, the prosecution must disclose any evidence

in its possession that is favorable to the defense, *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Commonwealth disclosed evidence in the instant case. An in camera inspection of the Commonwealth's file is not required unless there is reason to believe that evidence favorable to the defense will be revealed, *Commonwealth v. Gartner*, 475 Pa. 512, 381 A.2d 114 (1977). The Commonwealth does not violate the disclosure requirement by failing to disclose evidence that it does not have and of which it is not aware. *Commonwealth v. Bonacurso*, 500 Pa. 247, 455 A.2d 1175 (1983).

Appellant cites instances where he claims that evidence which was revealed at trial should have been disclosed previously. First, Barbara Livezey testified that decedent's truck was fired on five months before the murder. Second, the exhibits included the wallet of William Livezey, which contained a slip of paper on which the name "killer Eddy" and a telephone number were written. We find that neither of these pieces of evidence was exculpatory and that, therefore, no disclosure was required. Third, Daniel Thurber testified to a previously undisclosed inculpatory statement made by Appellant. The prosecutor testified and the trial court believed that the prosecution had not been aware of the statement. Fourth, challenged statements given by a Commonwealth witness and by a potential witness who did not testify, along with police reports concerning the death of William Livezey, were not in the possession of the Commonwealth prior to trial. They were turned over to the defense for review at the time of trial. The Commonwealth was not required to disclose these items of evidence, as it did not have them prior to trial. There was no indication that certain other undisclosed police reports were exculpatory. Appellant failed to establish grounds for an in camera inspection.

Appellant also claims that the court erred in not granting certain items of discovery that he recognizes were not mandatory. He relies on Rule of Criminal Procedure 305(B)(2), which allows discovery of non-mandatory items at

the discretion of the court. The rule covers the following items:

(a) the names and addresses of eyewitnesses;

(b) all written or recorded statements, and substantially verbatim oral statements, of eyewitnesses the Commonwealth intends to call at trial;

(c) all written or recorded statements, and substantially verbatim oral statements, made by co-defendants, and by co-conspirators or accomplices, whether such individuals have been charged or not;

(d) any other evidence specifically identified by the defendant, provided the defendant can additionally establish that its disclosure would be in the interests of justice.

One of the requested items was the criminal records of all Commonwealth witnesses. In *Commonwealth v. Williams*, 458 Pa. 319, 326 A.2d 300 (1974), we held such information need not be disclosed by the Commonwealth but is a proper subject for cross-examination. The defense did in fact cross-examine Commonwealth witnesses on their criminal records. Another requested item was the names and addresses of all witnesses the Commonwealth intended to call at trial. The rule covers eyewitnesses only, and there is no requirement that the Commonwealth disclose the names and addresses of all witnesses, *Commonwealth v. Bey*, 294 Pa.Super. 229, 439 A.2d 1175 (1982). The Commonwealth did in fact disclose all witnesses, including those who were not eyewitnesses. Appellant also requested discovery of plea bargains, deals, or immunities offered to witnesses. The Commonwealth represented that there were no such deals. The defense explored this matter on cross-examination, and no deals were revealed. Appellant requested F.B.I. reports on William Livezey. The Commonwealth did not have any such reports. There was no evidence that they existed. Finally, Appellant requested tape recordings of conversations between decedent and William Livezey. Typewritten transcripts were provided. We find that to be sufficient. There was no abuse of discretion in any of the court's discovery rulings.

■ Appellant argues that the court improperly admitted hearsay testimony. In his post-trial motions, he identified the witnesses who allegedly gave hearsay testimony but did not identify the statements which were allegedly inadmissible. In order to preserve such issue, it is necessary to identify the specific statements that are objected to, *Commonwealth v. Goldblum*, 498 Pa. 455, 447 A.2d 234 (1982). Appellant having failed to do so, his argument is waived.

■ Appellant next argues that unduly inflammatory and irrelevant evidence was admitted on several occasions. First, he claims that it was improper to admit a photograph of decedent's truck spattered with blood. The claim is waived, as Appellant did not object to the admission of the photograph at the time of trial, *Commonwealth v. Butts*, 495 Pa. 528, 434 A.2d 1216 (1981). Next, Appellant claims that it was error to allow a pathologist to give details of the autopsy performed on decedent. Medical testimony is admissible where it is relevant to establish the cause of death in a homicide case, *Commonwealth v. Hoffman*, 439 Pa. 348, 266 A.2d 726 (1970). In the instant case, the testimony showed that decedent died of a gunshot wound. It was relevant to establish criminal agency. Appellant also objects to the admission of testimony concerning the involvement of Appellant and William Livezey in drug traffic. Such testimony is admissible to show relationships among parties involved in crime, *Commonwealth v. Russell*, 459 Pa. 1, 326 A.2d 303 (1974). Appellant objected to a question addressed to Barbara Livezey as to whether William Livezey attended decedent's funeral. The trial court sustained the objection. There was therefore no prejudice to Appellant. Appellant next claims that it was improper to admit testimony about changes in his appearance since the time of the murder. Appellant was described as looking "more sophisticated" and as having cut his hair, trimmed his beard, and begun to wear glasses. Evidence of flight or self-concealment on the part of a person who knows that he or she is wanted for a crime may be admitted to show consciousness of guilt and may form a basis, along with

other evidence, for an inference of guilt, *Commonwealth v. Coyle*, 415 Pa. 379, 203 A.2d 782 (1964). Evidence of a change in appearance may be admitted to show concealment under this principle. See *Commonwealth v. Berrios*, 495 Pa. 444, 434 A.2d 1173 (1981). It was proper to admit the evidence of Appellant's change in appearance along with that of his movements outside the Commonwealth. Appellant claims that Daniel Thurber improperly testified about a relationship between Appellant and Thurber's wife. The claim is waived, as there was no objection to the testimony at trial. Finally Appellant claims that it was improper to admit testimony concerning the attempted arrest and suicide of William Livezey. The evidence was relevant, given that the relationship between Appellant and Livezey and their conspiracy to commit the murder had been established. Additionally, the suicide was relevant to show Livezey's state of mind, *Commonwealth v. Homeyer*, 373 Pa. 150, 94 A.2d 743 (1953).

Appellant next argues that the prosecutor engaged in misconduct by making certain remarks in his opening and closing statements. One of these was a statement in his opening address that he would show that Appellant attempted to flee when arrested in Tampa, Florida and then did not present evidence thereon. The prosecutor had a Tampa detective available to testify. He offered to prove through his testimony that the Tampa police went to a house to arrest Appellant. When they knocked on the door and identified themselves, Appellant ran out the side door, whereupon he was arrested. The defense objected to the proposed testimony. The objection was overruled, but the prosecutor elected not to present the testimony. In *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976), we held that when there is a good faith, reasonable basis for believing that a particular fact will be established during trial, it is proper to refer to such fact during the opening statement. We further held that even if an improper remark is made during an opening statement, there is no basis for relief unless the unavoidable effect is to prejudice

the jury so as to render it incapable of objective judgment. In the instant case, the prosecutor had the evidence available and reasonably expected to present it. The fact that he chose not to do so in the face of the objection by the defense did not render the opening statement improper. Furthermore, we find that the evidence was not prejudicial in view of the extensive evidence presented against Appellant. The prosecutor also stated in his opening that Eva Colson disappeared after learning that she was a suspect in the killing. That statement was proper, as the evidence established that she disappeared. Appellant also objects to the prosecutor's statement that Appellant intended to kill his wife. Daniel Thurber testified that Appellant told him of such intention. That statement, too, was proper. Appellant objects to several statements made by the prosecutor in his closing address. A prosecutor's closing remarks must be limited to facts in evidence and legitimate inferences therefrom, *Commonwealth v. Harvell*, 458 Pa. 406, 327 A.2d 27 (1974). Appellant objects to the following: The prosecutor described the effects of the gunshot wounds on decedent and said how they killed him. That statement was supported by the Pathologists's testimony. The prosecutor said that William Livezey killed himself. That was consistent with the evidence, which showed that Livezey died of a self-inflicted gunshot wound. The evidence supports the prosecutor's statements that William Livezey was involved in the killing of decedent and that Appellant did drug work for Livezey. The prosecutor described Appellant as the same type of person as William Livezey, Jerome Randis, Henry Glosemeyer, and Daniel Thurber. We have already discussed the evidence showing that Appellant conspired with Livezey to commit murder and was in the drug business with Livezey and Randis. Additionally, Glosemeyer testified that he sold drugs for Livezey. Thurber was a close associate of Appellant and resided with him in Florida for six months. We find all of the prosecutor's statements to be reasonable in light of the evidence.

■ Appellant claims that the prosecutor improperly advised certain witnesses not to speak with defense counsel in violation of a rule prohibiting the prosecution from interfering with defense interrogation of potential witnesses in the absence of an affirmative and convincing showing of exceptional circumstances, *Lewis v. Lebanon Court of Common Pleas*, 436 Pa. 296, 260 A.2d 184 (1969). Two of the witnesses in question were Commonwealth witnesses Thomas Stotsenburgh and Daniel Thurber. In support of his claim, Appellant cites his cross-examination of these witnesses. The relevant cross-examination of Stotsenburgh is as follows:

Q. Mr. Stotsenburgh, did you get a letter from me asking if I could meet and discuss the case a little bit further with you, by certified mail?

A. Yes, sir, I did.

Q. And did I ask you if you and I could meet so we could discuss the facts of the case at a time convenient to yourself at a place you found convenient also?

A. Yes, sir, I believe that was in the letter, yes.

Q. Did you ever respond to that?

A. I talked to the District Attorney in regard to it.

Q. You never called me back, right?

A. No, sir, I didn't.

Defense counsel questioned Thurber in a similar manner:

Q. Did you ever get a certified letter that I sent to you?

A. Yes.

Q. And in that certified letter I asked you if you would discuss your testimony with me and I would speak with you at any time or place convenient to yourself, did I not?

A. Yes.

Q. Did you ever respond?

A. Nope.

Q. How many times did you talk to the D.A. or prosecution about this case?

A. Twice.

The testimony shows only that defense counsel asked the witnesses to discuss their testimony with him and that they did not respond. There is no indication that their failure to respond was in any way caused by the prosecution. Appellant also complains about the prosecution's conduct in regard to Steven Belevary, a potential defense witness who was not called. Belevary was brought into the jurisdiction by the prosecution and was not initially available to the defense. However, the record shows that defense counsel's telephone number was given to Belevary, that the defense attorney met with Belevary and discussed his possible testimony, and that Belevary was available for further meetings. There is no indication that the prosecution advised him not to speak to the defense. There is no basis for a finding of prosecutorial interference in regard to any of the witnesses.

■■■ Appellant makes allegations of prosecutorial misconduct related to issues that have already been dealt with herein. He claims that the prosecutor engaged in misconduct by denying discovery that the defense was entitled to, by introducing hearsay statements, and by introducing irrelevant and inflammatory evidence. We have already determined that Appellant's arguments on these issues are either meritless or waived. Consequently, there is no basis for a finding of prosecutorial misconduct.

■■■ Appellant next claims that the trial court erred in denying various motions for a mistrial. He argues that he was entitled to a mistrial because of the prosecution's denial of discovery, introduction of hearsay, irrelevant, and inflammatory evidence, making of improper statements in the opening and closing addresses, and interference with witnesses. The decision as to whether to declare a mistrial is in the discretion of the trial court, *Commonwealth v. Craig*, 471 Pa. 310, 370 A.2d 317 (1977). We have already rejected Appellant's arguments on the issues on which his claim of entitlement to a mistrial is based. Therefore, we cannot find any abuse of discretion on the part of the court.

■ Appellant claims that the trial court improperly refused to conduct an evidentiary hearing on his post-trial motions. Appellant requested the hearing in order to re-hash his arguments on denial of discovery, interference with witnesses, and improper statements by the prosecutor. We find that the trial court ruled correctly on these issues and that there was no need for an evidentiary hearing.

■ Appellant also desired to argue for a new trial on the basis of after-discovered evidence. Appellant alleges that one Wayne Stanistreet was an associate of William Livezey. He would have testified that Livezey told him he killed decedent. Livezey did not implicate Appellant.

> After-discovered evidence is a basis for a new trial if it
>
> (1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely for impeaching credibility of a witness; and (4) is of such nature and character that a different verdict will likely result if a new trial is granted.

*Commonwealth v. Valderrama*, 479 Pa. 500, 388 A.2d 1042 (1978). Stanistreet's putative testimony would have corrob-orated the Commonwealth's theory of the case, i.e. that Livezey plotted the killing. Livezey's statement that he killed decedent was consistent with his involvement and did not exculpate Appellant. Stanistreet's testimony would not be likely to result in a different verdict, inasmuch as it does not contradict the Commonwealth's case and there is ample evidence implicating both Livezey and Appellant. Since Appellant did not allege the existence of evidence that would have been likely to result in a different verdict, it was reasonable to deny an evidentiary hearing.

■ There is no basis for awarding Appellant a new trial. Having so found, we will address Appellant's claim that he was improperly sentenced to death. He raises several arguments in support of that claim. One is that he cannot be sentenced to death for a murder that occurred prior to the effective date of the death penalty statute. As

we have noted, the present statute went into effect on September 13, 1978. The previous death penalty statute had been declared unconstitutional, *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977). In *Commonwealth v. Story, supra,* we held that the legislature did not intend to apply the present death penalty statute to offenses committed before its effective date and that it would not be so applied. *Story* controls the instant case. Since Appellant was convicted of a murder committed before September 13, 1978, his sentence must be modified to life imprisonment. It is so ordered.

Appellant also argues that the prosecution improperly refused to supply the defense with Appellant's employment records at the time of the sentencing hearing, that the trial court improperly refused to grant a continuance prior to such hearing, and that the death penalty statute is unconstitutional. As we have determined that the statute is inapplicable in the instant case, we need not address these arguments.

The judgment of sentence is affirmed as modified.

NIX, C.J., files a dissenting opinion.

NIX, Chief Justice, dissenting.

Although I recognize that the United States Supreme Court is moving in the opposite direction, *see Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), I remain convinced that the death qualification process produces juries which are both prosecution prone and unrepresentative of the community. *See Commonwealth v. Szuchon,* 506 Pa. 228, 260, 484 A.2d 1365, 1382 (1984) (Nix, C.J., dissenting); *Commonwealth v. Maxwell,* 505 Pa. 152, 172–174, 477 A.2d 1309, 1319, *cert. denied,* —— U.S. ——, 105 S.Ct. 370, 83 L.Ed.2d —— (1984) (Nix, C.J., dissenting). The results of that procedure are particularly offensive here since, as the majority acknowledges, the death penalty should never have been a factor in the case.