513 A.2d 1382

**COMMONWEALTH of Pennsylvania**

**v.**

**Eric MAXWELL, Appellant.**

Superior Court of Pennsylvania.

Argued May 20, 1986.

Filed Aug. 4, 1986.

Petition for Allowance of Appeal Granted Jan. 15, 1987.

578

---

Spero T. Lappas, Harrisburg, for appellant.

William A. Behe, Chief Deputy District Attorney, Harrisburg, for Com., appellee.

Before CIRILLO, President Judge, TAMILIA and HESTER, JJ.

TAMILIA, Judge:

This is an appeal from judgment of sentence entered after a jury found appellant guilty of first degree murder, robbery, and simple assault. The same jury further determined that appellant's sentence for the first degree murder conviction would be life imprisonment. The court then imposed a life sentence with an additional two to five years imprisonment on the remaining counts.

The lower court accurately summarized the pertinent facts as follows:

On March 15, 1984, an unmasked gunman entered the Thrift Drug Store located on South 29th Street in Harrisburg and demanded money from the cashier, Shavona Mitchell. The cashier placed the cash drawer in a paper bag and handed the package to the gunman. The gunman departed from the store and walked along the front of the store toward the Weis Market, located adjacent to the store. Spencer W. Arnold, Jr., a security guard employed by the Thrift Drug Store was summoned by the clerk and he immediately gave chase to the gunman. Arnold apprehended the gunman and started to walk him back to the drug store. Approaching the store, the gunman grabbed Arnold, threw him against the fence, pulled out a gun and shot him.

The gunman ran to his car and drove from the Weis Market parking lot at a high rate of speed. The gunman, later identified as Eric Maxwell, [appellant herein], drove to his sister's house where several friends were gathered. These friends later drove Maxwell to the York bus terminal where he boarded a bus bound for Baltimore. At the Baltimore bus station he was placed into custody on unrelated firearm charges. (Slip Op. at 1)

Appellant now raises ten issues for our review. He first contends the lower court erred in denying his motion to dismiss the charges pending against him based on a violation of Pa.R.Crim.P. 1100. In the instant action, the complaint against appellant was filed on March 16, 1984, and the case was not called for trial until November 12, 1984;

two months beyond September 12, 1984, the one-hundred eighty day run date as required by Pa.R.Crim.P. 1100.

Pa.R.Crim.P. 1100(a)(2) provides that;

"Trial in a court case in which a written complaint is filed against the defendant after June 30, 1974 shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed."

Pa.R.Crim.P. 1100(b) further provides that;

"For the purposes of this Rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, ..."

However, Pa.R.Crim.P. 1100(d)(3)(i) states;

"(d) In determining the period for commencement of trial, there shall be excluded therefrom:

.        .        .        .        .

(3) Such period of delay at any stage of the proceedings as results from:

(i) the unavailability of the defendant ..."

In the case *sub judice*, appellant was arrested in Baltimore on March 15, 1984 and was not returned to Dauphin County to stand trial on the charges herein until July 16, 1984. Upon motion of the Commonwealth for an extension of time to bring appellant to trial, the lower court found that the period of time the defendant spent in Maryland's custody was excludable from the computation of the one hundred and eighty days. We agree.

■ It is well settled in this Commonwealth that while mere incarceration in another jurisdiction does not make a defendant "unavailable" for purposes of Rule 1100(d), he will be deemed "unavailable" for the period of time during which his presence cannot be secured despite the due diligence of the Commonwealth. *Commonwealth v. Haynes*, 339 Pa.Super. 165, 168, 488 A.2d 602, 605 (1985). Due diligence must be defined on a case by case basis and requires a showing by the Commonwealth that a reasonable effort has been made to secure the defendant's attendance at trial; it does not require perfect vigilance and punctilious

care. *Commonwealth v. DeMarco*, 332 Pa.Super. 315, 319, 481 A.2d 632, 636 (1984). In reviewing a lower court's determination of whether the Commonwealth has met its burden of proving due diligence, this Court will consider "... only the evidence presented at the hearing by the Commonwealth and that evidence presented by the defendant which remains uncontradicted." *Commonwealth v. Donaldson*, 334 Pa.Super. 473, 476, 483 A.2d 549, 552 (1983). Also, absent an abuse of discretion, a grant of extension of time will not be overruled on appeal. *Commonwealth v. Lohr*, 503 Pa. 130, 468 A.2d 1375 (1983).

■ We find that the Commonwealth, without question, acted diligently in its efforts to return Maxwell to Dauphin County. A review of the pertinent dates testified to at the continuance hearing clearly supports this conclusion.

March 19, 1984—District Attorney's Office contacts Commonwealth's attorney in Baltimore and furnishes information that Dauphin County desires to try Mr. Maxwell on local charges as soon as possible.

—Copies of warrants, complaints, photographs and affidavits regarding the local case sent to the Fugitive Unit of the Baltimore Police Department.

March 28, 1984—Baltimore informs District Attorney's Office that Maryland intends to prosecute Mr. Maxwell on firearm charges.

March 19 to April 17, 1984—District Attorney's Office prepares extradition papers and sends them to Governor of Pennsylvania.

April 17, 1984—Extradition papers forwarded to the Governor of Maryland.

May 25, 1984—Correspondence sent to Baltimore requesting status of the Maxwell case in Baltimore. Letter indicates Dauphin County's desire to extradite Maxwell.

July 9, 1984—Maryland informs District Attorney's Office that Maxwell's charges in Maryland are placed on an inactive status and that they will formally arrest him for the Dauphin County charges.

582

July 16, 1984—Maxwell returned to Dauphin County

We therefore find the trial court did not abuse its discretion in finding due diligence.

■ Appellant next contends the trial court erred in compelling the disclosure of appellant's intoxication witnesses. Prior to trial, the defense filed a motion of mental infirmity defense based on intoxication. The Commonwealth filed a Motion to Compel Discovery asking, inter alia, the names and addresses of witnesses whom appellant intended to call at trial. The lower court granted the Commonwealth's motion and appellant now argues that the forced disclosure of this material "... resulted in a trial which was fundamentally unfair to the defendant inasmuch as he was deprived of the strategic impact of nondisclosure of his witnesses and witness list." (Appellant's brief at p. 26)

We find Pa.R.Crim.P. 305 C(1)(b) to be dispositive of the issue. This rule requires a defendant who intends to offer a claim of mental infirmity at trial to file notice with the Commonwealth of, among other things, the names and addresses of witnesses whom the defendant plans to call at trial in support thereof. Accordingly, we find the lower court correct in granting the Commonwealth's discovery motion.

On a related point, appellant contends the lower court erred in permitting the Commonwealth to introduce intoxication rebuttal testimony via a witness who was never identified during discovery. Appellant cites no authority for this position. We dismiss appellant's contention as meritless for here the record reflects that the witness in question was in fact listed as a defense witness on the issue of intoxication and at a discovery conference on September 14, 1984, the Commonwealth gave the defense two written statements of said witness.

Appellant's next points of argument are that the lower court erred in denying both his pre-trial motion to suppress statements he had given to police and his motion to suppress eye-witness identifications. We find the lower court

to have thoroughly addressed and correctly resolved these issues, and accordingly, we affirm as to these issues on the basis of the lower court's Opinion.

■ Appellant also avers that the Commonwealth presented insufficient evidence to sustain guilty verdicts of 1st degree murder and assault by physical menace. Appellant contends the evidence failed to show an intent to kill, but rather, indicated that the killing was the product of a panic situation exacerbated by his intoxication. It is also alleged that the evidence is insufficient to show beyond a reasonable doubt that appellant pointed a weapon at Nancy Toy, a bystander at the time of the robbery.

When reviewing a challenge to the sufficiency of the evidence, we must view all the evidence presented at trial, together with all reasonable inferences therefrom, in a light most favorable to the Commonwealth, and determine whether the trier of fact could have found each element of the offense supported by evidence and inferences to prove guilt beyond reasonable doubt. *Commonwealth v. Jackson,* 506 Pa. 469, 485 A.2d 1102 (1984).

Viewing the evidence against this standard, we can only conclude that appellant's contentions are completely devoid of merit. We are in full argreement with the lower courts finding that "[i]t does not even require the granting of favorable inferences to that testimony to determine that the jury was perfectly within its bounds in determining Mr. Maxwell was not intoxicated, or panic-stricken, when he shot the security guard who was in the process of apprehending him." (Slip Op. at 19)

■ Likewise, appellant's contention that the evidence was insufficient to prove appellant pointed a weapon against Nancy Toy is without merit. Nancy Toy repeatedly testified at trial that appellant pointed his weapon at her.

By way of example; on cross-examination, Nancy Toy testified to the following:

Q. "Now, Mrs. Toy, after this incident, after you heard that shot fired, you yourself were terrified for your life, were you not?

A. I was terrified when I saw him pointing the gun at me, yes."

(T.T. 11/20/84, pp. 315, 316) There can be no other conclusion drawn from the testimony but that appellant in fact pointed the gun at Nancy Toy.

■ Appellant next argues the lower court erred in refusing to strike the identifying testimony of witness Ronald Flynn because of an undisclosed and prejudicial photo-array. Mr. Ronald Flynn, the bus driver who drove appellant from York to Baltimore, was called by the Commonwealth as a rebuttal witness. He talked to appellant during the ride to Baltimore and upon arrival alerted a police officer to appellant's presence. Appellant claims Mr. Flynn should not have been permitted to identify him in-court on the ground that a previous photo-array was prejudicial and, therefore, tainted his subsequent in-court identification and testimony. Even if we were to assume the prior identification was improper, the law is clear that a subsequent in-court identification is admissible if it has a sufficient independent basis. *Commonwealth v. Connolly*, 478 Pa. 117, 385 A.2d 1342 (1978). There is no doubt that Ronald Flynn's in-court identification of appellant had an independent origin. Mr. Flynn talked with appellant during the trip from York to Baltimore and in fact gave a clear description of Maxwell to the police shortly after the episode. Therefore, appellant's contention is without merit.

■ Appellant also argues the trial court erred in overruling his objections to the testimony of Detective Richard Shultz. Detective Shultz testified that he had been a police officer in the Harrisburg Police Department for thirteen years. He testified that he has investigated approximately two hundred fifty (250) to three hundred (300) robberies during his thirteen years on the force. He was also able to testify that from his investigation of those robberies, less than ten percent (10%) of the assailants used or wore

masks. This statement was brought out to rebut defense counsel's remarks during his opening to the effect that appellant must have been drunk to rob a store without a mask on. We find there was no error in allowing Detective Shultz's testimony in this area. He was clearly testifying based on his everyday experience of thirteen years investigating numerous robberies.

Appellant next alleges the trial court erred in denying his challenges for cause to certain jurors. It is suggested that one prospective juror, Mrs. Brandt, should have been excused because she had nephews who were security guards and in this case the victim was a security guard. As for the two prospective jurors, Mrs. Huggins and Mrs. Kline, it is argued they should have been excused for cause because they believed the death penalty was the appropriate punishment for a person convicted of first degree murder.

Initially, we note that the decision of whether to disqualify a prospective juror is within the sound discretion of the trial court and will not be reversed on appeal in the absence of a palpable abuse of discretion. *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985). A challenge of a prospective juror should be sustained in two types of situations. One is where the juror indicates by his answers that he will not be an impartial juror. Another is when the juror has such a close relationship, familial, financial or situational, with the parties, counsel, victims or witnesses that the court will presume a likelihood of prejudice, irrespective of the answers given on voir dire. *Commonwealth v. Fletcher*, 245 Pa.Super. 88, 369 A.2d 307 (1976).

Furthermore, it must be determined whether the prospective juror can put aside any bias or prejudice upon instruction by the court. The judge must determine, on the basis of answers to questions and demeanor, whether the prospective juror is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence. *Colson, supra.* Jurors are not expected to be free from all prejudices, but rather, as a matter of law, they

are required to put aside their prejudices and determine guilt or innocence on the facts presented. *Commonwealth v. Howard,* 324 Pa.Super. 443, 471 A.2d 1239 (1984).

Applying the aforementioned standards to the case *sub judice,* we find no abuse of discretion by the lower court.

■ With respect to prospective juror Brandt, she testified to being unsure of whether she could dismiss from her mind the factual connection of employment with her nephews and the victim. She did not say she would not be fair, only that the task was made more difficult because of the occupational similarity. Her testimony also reveals that she was confused and not sure of herself. The trial court Opinion aptly addressed this situation:

> It is not unusual for jurors to be at times contradictory and at times ambiguous during their voir dire. They are lay persons who may never have been subject to such a process of questioning, in a courtroom, on a case they realize is very serious. They have not been coached in what to say or aided in preparation. They come from a cross-section of the community and their backgrounds, of education and experience, doubtless vary widely. Trial judges understand this and examine the total response of the prospective juror, including the juror's demeanor, as well as the substance of his answers in making the decision as to whether the juror can be impartial or cannot be impartial. *Patton v. Yount,* [467 U.S. 1025] 104 S.Ct. 2885 [81 L.Ed.2d 847] (1984)

(Slip Op. at 16)

Mrs. Brandt testified, in response to questioning as to whether she could give the defendant a fair trial, that:

> Well, I don't know that I wouldn't be fair, but it would be easier if it would be some occupation or another that you really weren't involved with or you have in your family.

(T.T. 11/12/84, p. 77)

We find that while Mrs. Brandt did have concerns she was candidly expressing, she also expressed a willingness to

attempt to reach a decision based upon the evidence and thus denial of the challenge for cause was not an abuse of discretion.

■ Likewise, we find that Mrs. Huggins and Mrs. Kline satisfactorily expressed their willingness to apply the law to the facts despite their feelings on the death penalty.

Mrs. Kline testified, in part, to the following: "I would try to follow the law. I'm not sure if I might be a little bit biased, but I would try to." (T.T. 11/12/84, p. 133)

Similarly, Mrs. Huggins engaged in a colloquy with the court:

By the Court:

.    .    .    .    .

Now, if you were on this jury and there was evidence of aggravating circumstances and there was evidence of mitigating circumstances and I told you as a juror to consider both of those things, would you do that?

A: Yes.

Q: And if it was defined for you now, considering the aggravating and mitigating circumstances, and we told you how the law says you weigh those things to determine what the appropriate penalty was, would you use your best efforts to follow those instructions and arrive at the proper decision?

A: Yes.

(T.T. 11/12/84, pp. 98, 99)

We find, based upon the relevant case law and the jurors' testimony cited above, the lower court did not abuse its discretion in denying all three of appellant's challenges for cause.

■ Appellant further argues the trial court erred in allowing the Commonwealth to question prospective jurors concerning their general beliefs in the death penalty. Such questioning is clearly permissible since knowledge of a prospective juror's views on the death penalty is absolutely vital to both counsel in determining whether, first, to chal-

lenge for cause, or second, to challenge peremptorily. Prosecutors are entitled to exclude those jurors whose scruples against the death penalty are so strong that they could not follow their oaths and apply the law. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Recently, in *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the United States Supreme Court upheld the practice of keeping *"Witherspoon* excludable" potential jurors off both the guilty-innocence and the sentencing stages of capital cases. Thus, in light of these pronouncements, we find no merit in appellant's claim that questioning prospective jurors as to their capital punishment beliefs is improper.

Finally, appellant contends the court erred in denying him a pre-trial determination as to the existence of aggravating circumstances and in denying a pre-trial motion for bifurcation of the trial, to provide for two juries, one which would determine his guilt or innocence and one which would determine the penalty. Again, appellant's arguments are premised on the notion of a "conviction prone" jury.

Appellant argues that the Commonwealth should be required to establish the existence of aggravating circumstances before permitting the selection of a jury, utilizing, in part, questions about capital punishment. Appellant contends that selection of a jury based upon questioning of beliefs in the death penalty secures a jury more likely to be "conviction prone" and, therefore, aggravating circumstances should be shown before a "conviction prone" jury is chosen. It is well settled that the exclusion of jurors opposed to capital punishment does not result in an unrepresentative jury and does not substantially increase the risk of conviction. *Lockhart, supra; Witherspoon, supra; Commonwealth v. Morales*, 508 Pa. 51, 494 A.2d 367 (1985). Thus, we conclude there is no need or reason to preliminarily inquire into the issue of aggravating circumstances. Likewise, appellant's contention that the trial should have been bifurcated because a death-qualified jury is more likely to convict is also without merit based upon the aforemen-

tioned cases which provide that capital punishment questions do not result in the selection of a jury that is unfairly selected or that is conviction prone.

According, the judgment of the lower court is affirmed.

Judgment affirmed.